HAWTHORNE, Justice.
This is an appeal by Robert Palmer, a Negro, who was charged with the murder of his wife, tried, convicted, and sentenced to death.
Appellant first claims that the trial judge erred in overruling his various motions to quash the indictment. These motions are predicated upon the contentions, first, that there has existed in Orleans Parish since time immemorial a systematic exclusion of Negroes from grand juries, in contravention of constitutional guarantees; and, second, that there were no Negroes on the grand jury which indicted appellant, but that if there were, they were placed on the jury in a systematic or purposeful inclusion of a token number, which is as constitutionally objectionable as exclusion.
In this case there is no dispute as to the law as announced by the Supreme Court of the United States and this court, to the effect that it is a denial of the equal protection of the laws to try a defendant of a particular race or color under an indictment found by a grand jury from which all persons of his race or color have, solely because of that race or color, been systematically excluded; likewise, that a systematic or purposeful inclusion of a token number of persons of a particular race is as constitutionally objectionable as exclusion.
The manner of selecting juries, both grand and petit, in the Parish of Orleans is prescribed by the Code of Criminal Procedure, Articles 191 et seq. Under this law a jury commission composed of four persons shall select at large and impartially from the citizens of the parish having the qualifications requisite to register as voters 750 persons possessing the qualifications of jurors. The names of the persons so selected shall be placed in a jury wheel from which at six-month intervals the commissioners shall draw not less than 75 names which shall constitute the grand jury list or venire.
This grand jury list is submitted to the judge of the Criminal District Court for the Parish of Orleans whose turn it shall happen then to be to empanel the incoming grand jury, and from the names thus submitted the judge shall select 12 persons who shall constitute the grand jury for the Parish of Orleans for the ensuing grand jury term.
The jury commission in selecting the general venire of 750 persons must select persons possessing the qualifications to serve as grand jurors, as prescribed in Article 172 of the Code of Criminal Procedure, that is: They must be citizens of this state, not less than 21 years of age, bona fide residents of the parish in which the court is being held for one year preceding such service, able to read and write the English language, not under interdiction or charged with any offense, or convicted at *475 any time of any felony, and in addition must be persons of well known good character and standing in the community.
It is conceded in the instant case, and the record so shows, that members of the Negro race constitute a large segment of the population of the City of New Orleans, and that a number of them possess the necessary qualifications for jury service. The jury commission for a number of years has made a sincere effort to secure the names of qualified Negroes to place in the jury wheel for service both as grand and as petit jurors. In its efforts to find qualified Negroes for jury duty the jury commission has consulted Negro leaders and had them submit names, and has consulted the city directory, the registration rolls, lists from Negro housing projects, and other means at its disposal. In fact, the record shows that the jury commission has made a special effort to see that Negroes were included in the jury list.[1] As a result of these conscientious efforts on the part of the members of the jury commission, the names of varying numbers of Negroes have for several years been included in the jury wheel.
The record does not give any support to appellant’s contention that the jury commission in selecting the general venire has systematically excluded Negroes because of race or color, or that it has as a subterfuge systematically limited the number of Negroes whose names are contained in the general venire list.
In the instant case, in the grand jury list of 100 names submitted to the district judge there were the names of 10 Negroes, and on the jury of 12 selected by the judge to compose the grand jury which returned the indictment in the instant case two Negroes were selected and served on the grand jury.
Under our law, in the Parish of Orleans the judge selects the entire jury and is charged with the duty of choosing those who in his judgment are the best qualified to serve as grand jurors, and there is no showing or proof that the judge deliberately and intentionally limited to two the number of Negroes so chosen. In fact, the judge in the instant case interviewed a number of Negroes on the grand jury list, and there is nothing in the record to show that he would not have selected all the Negroes on the list had they possessed superior qualifications or qualifications on a par with those of the other 10 persons whom he chose. There is a presumption that the judge in choosing the instant jury did his duty according to law. It is well established that in cases such as this the burden is upon the defendant to establish the discrimination, and there is no evidence which would even tend to show that the jury corn- *477 mission and the judge practiced either systematic discrimination against Negroes or systematic token inclusion of them.
Appellant also argues that there were no Negroes on the grand jury which found the indictment in this case within the definition of the word “Negro”. In other words, he is attempting to draw a distinction between a person of color and a Negro. The two grand jurors to whom we have referred as Negroes gave us the benefit of their testimony on the trial of this motion to quash. Both testified that they had always considered themselves Negroes, and that others always had so regarded them. Their birth certificates showed their race as colored, and so far as they knew, all of their ancestors considered themselves Negroes.
Appellant would have us say that discrimination exists because appellant is a Negro but these two jurors are members of the colored race and therefore are not of the same race and class as the accused. This novel effort to show discrimination is completely unrealistic. Appellant in effect is arguing that there exist two or more classes of Negroes, and that a Negro of any one of the so-called classes may allege that his class has been discriminated against in the matter of drawing juries if members of his particular class are excluded from the venirq by reason of being members of that particular class of Negroes, even though members of other classes of Negroes have been included in the venire.
The proof here is sufficient that the two jurors whom appellant classes as persons of color were in fact members of the Negro race, the same race and class as the accused.
Appellant next says that the trial judge erred in his refusal to appoint a lunacy commission for the purpose of inquiring into his sanity. The trial judge correctly answered this contention thus:
“This Bill of Exception was reserved when the Court, after a hearing, denied defendant’s application for a lunacy commission. The application itself states no facts to support the appointment of a commission. As a matter of fact, the only allegation of fact in the application is that defendant is an alcoholic and does suffer from ‘alcoholic amnesia’.
“On the hearing, the only evidence offered by defendant was his own testimony. This testimony indicates only that defendant once consulted a psychiatrist while in the Service and was told that ‘he might be an alcoholic’. Also, defendant testified that on occasion when he drank too much he had no recollection of his behavior while under the influence of alcohol.
“As was pointed out by me during the course of the hearing, there is nothing in *479 the record to indicate even the remotest possibility of insanity. Moreover, defendant’s actions and behavior on the stand during the hearing indicated complete sanity rather than insanity. Under these circumstances, I exercised the discretion granted me under the law and refused to appoint a lunacy commission. See State v. Messer, 1940, 194 La. 238, 193 So. 633; State v. McManus, 1937, 187 La. 9, 174 So. 91; State v. Bentl[e]y, 1951, 219 La. 893, 54 So.2d 137.
“Therefore this Bill of Exception is without merit.”
One of the many errors of which appellant also complains occurred during the course of the trial under the following circumstances : After the State had rested its case and the case was with the defense, the accused was called as a witness to testify in his 'own behalf. During his cross-examination the State proceeded to question him about certain statements he had made to a newspaper man, all over the objection of the attorney for the accused. The accused was asked at this time whether he remembered talking to the newspaper man, which he admitted, and also was asked whether he remembered telling this newspaper man about the killing and whether he remembered telling him what happened the night of the homicide. The objections were overruled, and the accused answered that he remembered the interview with the newspaper man but did not remember making any of the other statements. After the defense had rested its case, the newspaper man was placed on the stand for the purpose of impeachment and to rebut the accused’s testimony that he did not now remember and never had had any recollection of the crime. This witness was permitted to testify, over defense counsel’s objection, as to the statements of which the accused himself had denied any memory. This witness testified that the accused stated to him that he arrived at home in the early hours of the morning on which the homicide occurred, that he had been drinking a great deal, that; he became involved in an argument with' his wife and ordered her to leave the apartment, and that she refused to do so; that he did not remember what happened after-wards except that when he came to his senses, he heard some one calling him; that he ran out of the house, approached a taxi driver, gave him the gun, and then fled on foot to Louisiana Avenue and hid under a house. • "
Although this statement may not be a confession in the strict meaning of that term as used in our Code of Criminal Procedure, it is undoubtedly a statement containing inculpatory facts, as it placed the defendant at the scene of the homicide and showed that he had been drinking, that he had a quarrel with his wife, that he fled *481 from the house with a gun in his hand, and that he ran and hid.
The statement made by this accused which the newspaper man related was objected to by defense counsel, as admitted in the State’s brief filed here, on the principal grounds that it was not covered in the State’s opening statement to the jury, and that it was not shown to have been made freely and voluntarily as a foundation for its admissibility.
It is well settled in the jurisprudence of this state that admissions involving the existence of criminal intent or inculpatory facts are governed by the rules applicable to confessions. State v. Hayes, 162 La. 310, 110 So. 486; State v. Crittenden, 214 La. 81, 36 So.2d 645; State v. Robinson, 215 La. 974, 41 So.2d 848; State v. Clark, 228 La. 899, 84 So.2d 452. It will thus be seen that the statement which the State offered here over the objection of the accused was of such a nature that it could not have been offered while the case was with the State in chief both without a compliance with the provisions of Article 333 of the Code of Criminal Procedure by reference to it, either specifically or in general terms, in the opening statement of the district attorney explaining the nature of the charge and the evidence by which the State expected to establish the same, and also without the laying of the proper foundation for its admissibility by a showing that it had been freely and voluntarily given pursuant to the provisions of Article 451 of the Code of Criminal Procedure and Article 1, Section 11, of the Louisiana Constitution of 1921.
No contention is made here, nor does the record disclose, that any reference was made to the statement by the district attorney in his opening statement to the jury, or that the foundation was laid for its admissibility as an admission of inculpatory facts. The question then is: Was the statement admissible solely for the purpose of impeaching the testimony of the accused by the State on rebuttal, in spite of the State’s failure to make reference to it in the opening statement and in spite of the failure to lay the proper foundation for its admissibility as an admission of inculpatory facts? We think that the question posed is fully answered by the jurisprudence of this state.
In State v. Hayes, supra, the defendant, as here, took the stand as a witness in his own behalf and gave evidence in conflict with certain statements that he had made before the trial. After the defense had closed its case, the State called to the stand witnesses for the purpose of showing the various statements which the defendant had denied having made. The defense objected on the ground that these statements had not been shown to have been freely and voluntarily made. These statements which were *483 offered by' the State were of a highly incriminating nature. This court in reversing the conviction said. [162 La. 310, 110 So. 489]:
“However, as we have seen, the statements in this instance were not offered as substantive evidence, but merely as impeaching evidence, and the jury were so instructed by the court. Still, in our view, that makes no difference. The same rule, applicable to the admission of a confession, not voluntarily given, to impeach the evidence of an accused on trial, is, we think, applicable to the admissibility of incriminatory statements, when offered for the same purpose. * * *
* * *
“Since, when a confession is objected to as one not voluntarily made, the state must show that it was so made, before it can be received in evidence, and the defendant must be given an opportunity to offer in rebuttal his evidence, we think the same rule- governs the admissibility of incriminatory statements, whether they are offered as substantive or impeaching evidence. * * * ” (Italics ours.)
The rule announced in the Hayes case, that the proper foundation for the admissibility of admissions of inculpatory facts had to be laid, was approved by this court in the recent case of State v. Clark, supra, in which we quoted at length from the Hayes case.
In State v. Ward, 187 La. 585, 175 So. 69, during the cross-examination of the defendant the State used a confession made by Ward as an attack upon his credibility and to contradict him, although the State had failed to lay the proper predicate in the opening statement for the admissibility of this confession and the defense objected to its admission on that ground. This court in reversing the conviction pointed out that the confession was inadmissible and could not be heard by the jury because the State had failed to lay the proper predicate in the opening statement for its admissibility, and that the State could not indirectly by a process of cross-examination, on the theory of contradiction and an attack on the accused’s credibility as a witness, have the jury hear the contents of such a confession. Moreover, in that case the court pointed out that the State did not lay the foundation for the admission of the confession by showing that it was freely and voluntarily given, and that to say that this confession could be shown by cross-examination of the defendant would, in effect, be saying that the State could dispense with both the requirements of the law that the confession must be mentioned in the opening statement and that the proper foundation must be laid by a showing that it was free and voluntary.
In the instant case the trial court should have sustained defense counsel’s objection *485 to the admission of the inculpatory statement on the grounds that the proper predicate had not been laid for its admissibility by the State in its opening statement to the jury and that it was not shown to have been freely and voluntarily given.
The State cites and relies on the recent case of State v. Sheffield, 232 La.Sup. 53, 93 So.2d 691, and argues that we held there that a confession may be admitted by way of rebuttal to impeach the testimony of a defendant without the establishing of its voluntary character. In that case the record discloses that no contention was made that the statement was not shown to be freely and voluntarily given, and we were not called upon to pass upon this question. Be that as it may, our holding there in no way can be construed as abrogating the rule of law established by the Ward case that a confession cannot be admitted even though used by way of rebuttal and for the purpose of impeachment without the laying of a predicate for its introduction in the opening statement of the district attorney. In the Sheffield case the court was careful to point out that the confession or statement there used had been covered by the opening statement.
For the reasons assigned the verdict and sentence are annulled and set aside, and the case is remanded to the lower court for a new trial.
FOUR.NET, C. J., absent.

. The efforts of the jury commission to obtain qualified jurors for the general venire list are fully set out in the opinion of this court rendered this day in the ease of State v. Eubanks, 232 La. 289, 94 So.2d 262.