FOURNET, Chief Justice.[1]
The defendant, charged by indictment with theft,[2] was prosecuted, as reflected by the state’s Bill of Particulars, as a principal,[3] in that he aided and abetted one Elousie Stegall in committing the offense. In this appeal from his conviction and sentence he relies on all of the bills reserved and perfected during the course of the trial; however, we think that, - taken together, they constitute only two issues, the first being that the act charged in the indictment, as the facts upon which it is based are detailed in the state’s Bill of Particulars, even if entirely true, does not constitute theft as defined in the Criminal Code. In other words, defendant contends the facts upon which the indictment is based as given in the Bill of Particulars do not constitute the crime • of theft; consequently, even if proved in their entirety, this would still not be sufficient to prove such a charge within the meaning and contemplation of R.S. 14:67.
The indictment was drawn in strict conformity with the short form spe *288 cifically authorized in Article 235 of the Code of Criminal Procedure and is, therefore, valid on its face.[4] And, when considered in the light of the detailed facts furnished by the state, which will be referred to more particularly hereinafter, it is evident the defendant was sufficiently apprized of the nature and cause of the accusation against him, and also that it is sufficient to protect him against a subsequent prosecution for the same act. Furthermore, although the appellate jurisdiction of the Supreme Court is specifically limited by the Louisiana constitution to questions of law alone,[5] when it is asserted, as here, that there is a total lack of evidence to support the conviction of the crime charged, or any element thereof, this raises a question of law that is subject to our review.[6]
As revealed by the record, the undisputed facts, so far as pertinent to the issues in this case, are that according to the rules of the Louisiana State Senate each senator is allowed to employ a secretary of his own choice to serve him during each day the legislature is in session, and this secretary is paid out of money appropriated by the legislature to cover expenses of the session at the rate of $10 a day unless the senator is chairman of a committee, in which event the rate is $15 a day. Such secretaries have-no duties other than as prescribed by the-individual senator who employs them, and are subject to no supervision of any kind by the senate or any of its officials. This, is clearly established by the testimony of the senate’s secretary, Charles William Roberts,[7] who testified as a witness for the *290 state, and is corroborated by a stipulation of counsel to the effect that if the Lieutenant Governor, who serves as ex-officio president of the senate, were called to testify his testimony would be for all intents and purposes the same.
In conformity with these senate rules the defendant, as Chairman of the Senate’s Judiciary A. Committee secured the services of one Elouise Stegall to take care of his secretarial needs as a senator during the 1962 and 1963 sessions. Miss Stegall, being a full-time employee of the Conservation Department of the state at the time, could not be carried on the payroll of the senate because of the dual office holding law;[8] hence, it was agreed, with the full consent and cooperation of her sister, Mrs. Mary Lou Alsobrooks, that the sister’s name would be placed on the payroll while she (Miss Stegall) would do the secretarial work required of her by the defendant and receive the salary. Prior to the 1963 session, however, because of the sister’s request that her name no longer be used in this manner in view of the marital difficulties she was then having with her husband, Miss Stegall requested that the defendant place the name of Charlyn Stokes on the payroll, which he did after she furnished him with a *292 withholding’ certificate purportedly signed hy Charlyn Stokes and on which was listed her social security number and address. It was shown during the trial, however, that this lady’s name was listed on the payroll without her knowledge or consent,[9] and that the checks issued in her name during the 1963 session were cashed by Miss Stegall after she forged the endorsement of the payee thereon. One of these checks forms the basis for this prosecution.[10]
Defense counsel argues that inasmuch as the evidence unmistakably shows the defendant received none of the money; that it was appropriated by the legislature for the specific purpose for which it was, in fact, used, i. e., to pay for secretarial services rendered Senator Frugé in accordance with his requirements during the 1963 session, it cannot be said the subject money was stolen from the state because the state has received full value therefor. Counsel argues, additionally, that the placement of the name of Charlyn Stokes on the payroll instead of that of Miss Stegall, who actually did the work, does not detract from the fact that such conduct fails to come within the scope of the theft article. He argues, still further, that if the fact the name of Charlyn Stokes was used without her consent, and Miss Stegall forged the endorsement of this lady to secure the money, is deemed to constitute the fraud necessary to support a charge of theft, then the defendant could not be a principal to such a charge on this basis because the record unmistakably discloses he had no knowledge whatever as to the lack of consent by Charlyn Stokes and the forgery of her name until the investigation of the matter was called to his attention.
Because of these facts, counsel argues in brief that in considering them “besides recognizing that criminal and penal statutes are strictly construed, we must likewise recognize that our theft article is broadly stated and very general in terms. In interpreting this article, particularly where it is a question where the given facts fall within its prohibition, strong consideration must be given to the point that at the same time as R.S. 14:67 was adopted, as part of the Criminal Code, the legislature included other specific articles denouncing in very specific terms the conduct charged. R.S. 14:137, *294 14:138 and 14:139 all denounce conduct on the part of public officials or employees with relation to their public employment encompassing dual office holding, public payroll fraud, and political payroll padding. * * * That the legislature did not intend this conduct to be theft is demonstrated by the inclusion in the code of these specific sections. While it is true that R.S. 14:4 permits the district attorney to prosecute under more than one section where conduct is clearly covered by more than one section, there must first be a finding, as a matter of law, that both sections are applicable. In making this determination, a basic rule of statutory construction, more strictly applied in criminal cases, is applicable. In this case, 'any doubt as to whether conduct of this sort is covered by the theft article should be resolved in the negative, where the conduct charged fits exactly into the specific sections and does not go beyond the conduct specifically denounced in any respect.”
Counsel points out further that the defense contention “in this respect is fortified by the history of the particular sections in question, and by the reporters’ notes concerning each.” The notes under R.S. 14:67 point out that nearly SO independent statutes previously in existence were merged into the theft article. Significantly, the statutes then in existence dealing with dual office holding, etc., are not among those listed. Equally significant are the source notes of R.S. 14:137; 14:138, ahd 14:139, each citing a statute then in existence as the basis for the article in the then new code.
This argument would seem to logically follow, but it is clear the theft article in its broad and all embracive language includes the conduct forming the basis of the charge in this case; hence, the district attorney, under the express provisions of the Criminal Code had the discretion of proceeding under either the general article or the special article.
It is apt to observe here that the defendant did not, in fact, receive any of the funds forming the basis for this prosecution, but, as stated above, he is charged as a principal in that he aided and abetted Miss Stegall, who rendered the secretarial services he required and received the funds the state allotted him to pay for such services; and that the record is totally lacking in any evidence whatsoever to show that the defendant had any knowledge of the fact that the name of Charlyn Stokes was being used without her consent, or that her signature on the check had been forged until the commencement of the investigation in the instant case, which was a year later. All of this, when considered with the custom and rules of the .senate in existence at the time with respect to the selection and duties .of the secretaries to senators, would seem to lend support to the defendant in his belief that he had done no wrong and that his entire conduct was in conformity with *296 the customs and rules of the senate.[11] Nevertheless, the appellant knew that Elouise Stegall could not be employed as his secretary during the legislative session for the simple reason that this was prohibited by law since she was at the time already employed in another department of the state government. The fact that he used another name to accomplish this does not detract from the fact that the money was secured from the state and given to Miss Stegall contrary to law.
This brings up for our consideration the other issue we must resolve, i. e., the one relating to the admissibility of a verbal conversation between the district attorney and the defendant, the electronic recording thereof taken without defendant’s knowledge, and a transcription of which was made by the district attorney’s secretary. The defendant sought to have these excluded under a motion to suppress and objections to their admissibility when they were offered at the trial on the ground they were assertedly not freely and voluntarily given, and for other reasons that are not urged on this appeal.
In his per curiam to the motion to suppress, the trial judge advises he found that on May 1, 1964, Elouise Stegall made a statement to'one of the assistant district attorneys which implicated the defendant. On the following day, when the Senator was informed by the Lieutenant Governor that an investigation was being conducted by the district attorney’s office which involved persons he had recommended for senate secretarial jobs, he telephoned the district attorney at his home to discuss the matter. The district attorney, in substance, told him he could not talk at that time and suggested the defendant come to his office on Monday, May 4, 1964. On that day Senator Frugé appeared at the office and requested a private audience, whereupon all others were excluded from the room in apparent acquiescence. However, unknown to the Senator the district attorney had “bugged” his office with an electronic recording device, and their conversation was also monitored by an assistant in another office. During the course of this conversation the defendant made inculpatory statements.
Counsel for the defendant contends this so-called confession cannot be said to have been voluntarily made under these circumstances, claiming the mere fact it was not induced by a promise or threat is not enough where it is secured unfairly, because a confession can only be voluntary in law if, and only if, it is voluntary in fact. He cites State v. Henry, 196 La. 217, 198 So. 910; and State v. Graffam, 202 La. 869, 13 So.2d 249.
*298 From a reading of the transcription of this conversation it is clear that the Senator "had no idea at the time that the investigation involved him personally. It is equally ■clear that he approached the district attormey in the belief that as a fellow lawyer, .and because of their personal friendship, together with the further fact the state had .suffered no loss due to the actions of Miss Stegall, he could convince the district attorney to use his good offices in not prosecuting Miss Stegall, and thus protect him and liis family from the unfavorable publicity that would ensue.
Inculpatory statements are gov•erned by the law applicable to confessions [12] and we are constrained to hold in the instant case that the conversation between the district attorney and the defendant, admitted over defense objection, including as it does inculpatory statements, was voluntarily made. While it may be said that these statements resulted from defendant’s misplaced confidence, there is nothing about them to impugn their voluntary character. The electronic recording of the conversation was also properly admitted for the purpose of corroborating the testimony of the district attorney with respect thereto, as well as to whether it was given voluntarily. State v. Melerine, 236 La. 929, 109 So.2d 471. It would be different if the recording device had been secretly installed in the Senator’s office, home, or automobile, or, conceivably, upon his person. That would involve an invasion of his privacy, a trespass which would present constitutional questions of grave import. Here, however, it was Senator Frugé who sought the district attorney in his office. See, Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462.
For the reasons assigned, the conviction and sentence arc affirmed.

. Because of the importance of this case, involving, as it does, the appeal of an official of this state from his conviction as a principal on an indictment charging him with theft, the decision was not handed down prior to adjournment of the court in June of 1967 in order that each member of the court, if desired, might be afforded an opportunity to review the record in the case during the summer months.-

. “Theft is the misappropriation or taking of anything of value which belongs to another, either without' the consent of the other to -the misappropriation or taking, or by means of fraudulent conduct, practices or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.” R.S. 14:67.

.K.S. 14:24 provides that “All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offeiise, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” ‘ •

. R.S. 15:235 provides it is sufficient, in • charging theft, to state in the indictment that “A. ,B. committed a theft of * * * (describe property and subject of theft and state its value).”

. Section 10 of Article VII of the constitution provides : “The appellate jurisdiction of. the Supreme Court shall also extend to criminal eases on questions of law alone, whenever the penalty of death, or imprisonment at hard labor may be imposed ; or where a fine exceeding three hundred dollars or imprisonment exceeding six months has been actually imposed.” (The emphasis has been supplied.)

. State v. Holder, 159 La. 82, 105 So. 232; State v. McDonell, 208 La. 602, 23 So. 2d 230; State v. Mattio, 212 La. 284, 31 So.2d 801, certiorari denied 332 U.S. 818, 68 S.Ct. 145, 92 L.Ed. 395; State v. Roberts, 224 La. 491, 70 So.2d 100; State v. Heiman, 227 La. 235, 79 So.2d 78; State v. Kelly, 241 La. 725, 131 So. 2d 43, and the authorities therein cited.

.The pertinent testimony of Hr. Roberts while under cross-examination, beginning at page 357 of the record, is as follows:
Q. With reference to the secretary, as a matter of custom, can any Senator, including Senator Jack Frugé, recommend anybody he wants, including his wife or his son or his mother or anybody like that?
A. That is correct.
Q. And it would not make any difference to you as the Clerk of the Senate or the Lieutenant Governor so long as that recommendation was given by the Senator, isn’t that right?
A. That is correct sir.
Q. So it would be at the entire disposal of the particular Senator as to what it would do with the money that was allotted to him for a secretary, isn’t that-right?
A. That is correct, sir. The duties of that secretary do not come under, that i& *290 not a part of my supervision, and it is not a part of the operation we are doing there. It is whatever the Senator has decided.
Q. Whatever the Senator wants to do with that money or what he wants to do with his secretary is left up to him, is that correct?
A. That is correct, sir.
Q. In other words, the secretaries don’t have to report to you in the Senate or anybody else in the Senate, is that right?
A. That is correct, sir.
Q. They do not have any prescribed, detailed work for anybody, is that correct?
A. For the Senator is what they are working for. They don’t have any other duties as far as I am concerned.
tjs * * * *
Q. And it is left up to the individual Senator to do what he wants, is that right?
A. That is correct, sir.
Q. There is no requirement that the secretaries report to any office, is that correct?
A. That is correct.
Q. There is no requirement that they perform any type of services at all except what the Senator might want or might not want done, is that correct?
A. What he instructs them to do.
Q. It is more in the nature of a political patronage then, isn’t it?
A. Well, that would be for you to say, sir.
*!{:***
Q. And all the requirements you all have in the Senate is that a recommendation slip be signed by the Senator and you get a Withholding Exemption Form and the Social Security number and address so you can mail the W-2 form, isn’t that correct?
A. Yes sir.
Q. And the rest of it is left to the discretion of the Senator?
A. That is correct, sir. (All emphasis has been supplied.)

. The pertinent part of R.S. 14:137 provides that “Dual office holding is committed when any person holding or exercising any office, position, or employment of profit, in one of the three departments of government of the State of Louisiana, holds or exercises another office, position, or employment of profit: (1) In the same department or any other department of the State of Louisiana * * *”

. On cross-examination Charlyn Stokes admitted she was told later in the year about the arrangements her mother-in-law made with Miss Stegall, but she thought it involved personal cheeks of Senator Frugé. See, transcript, page 329.

. Some 24 indictments were returned, 16 against Senator Frugé and 8 against Miss Stegall. In- none of these were they charged jointly. Both were charged individually with theft under R.S. 14:67 and with forgery under R.S. 14:72 as to each and every check issued to Mrs. Also-brooks and Charlyn Stokes. In addition, Senator Frugé was charged with public payroll fraud under R.S. 14:138, and with conspiracy to commit each and every one of these respective crimes under R.S. 14:26. Senator Frugé alone has been brought to trial, Miss Stegall having turned state’s witness.

. It seems obvious these were considered as mitigating circumstances by the trial judge, for he suspended the sentence imposed and the accused was “placed on unsupervised probation.”

. State v. Robinson, 215 La. 974, 41 So. 2d 848; State v. Domino, 234 La. 950, 102 So.2d 227; State v. Clark, 228 La. 899, 84 So.2d 452; State v. Jones, 230 La. 356, 88 So.2d 655; State v. Palmer, 232 La. 468, 94 So.2d 439; State v. Maney, 242 La. 223, 135 So.2d 473; State v. Bueche, 243 La. 160, 142 So. 2d 381; and State v. Andrus, 250 La. 765, 199 So.2d 867.