[Crim. No. 7456. In Bank. March 11, 1964.]

THE PEOPLE, Plaintiff and Respondent, v. O'NEAL UNDERWOOD, Defendant and Appellant.

Harry E. Rice, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, Albert W. Harris, Jr., Keith E. Pugh, Jr., and Edward P. O'Brien, Deputy Attorneys General, for Plaintiff and Respondent.

GIBSON, C. J.—O'Neal Underwood and his 17-year-old cousin, Marshall Wisdom, were jointly charged with rape, robbery, and kidnaping. After the preliminary hearing the charges against Wisdom were suspended, and he testified as a prosecution witness at the trial of Underwood.[1] A jury found defendant guilty of the crimes with which he was charged, and he has appealed from the judgment of conviction, contending that the court erred in admitting evidence of extrajudicial statements made by himself and by Wisdom which were, assertedly, the product of police coercion.

Mrs. Mamie Dozier, the prosecuting witness, gave the following version of what had occurred: About 11 p.m. on September 30, 1961, she left her home to drive to a store. She was wearing a formfitting sheath dress with "slits in the back

---

[1] Prior to defendant's trial Wisdom was declared a ward of the juvenile court and was returned to the custody of his parents under parole supervision. Later the juvenile proceedings against Wisdom were dismissed.

running up and down," which she intended to wear to a dance at a men's "social club" later that night, and she did not have on any underclothes. She stopped on her way to the store at a public telephone booth to call a friend. As she returned to her car, defendant, whom she had never seen before, got out of another car and approached her. He asked her if she could tell him the location of Sanford Avenue, and she replied that if he would follow her in his car she would sound her horn when they arrived there. On reaching Sanford Avenue she sounded her horn and stopped her car in order to make a turn. Defendant, who with Wisdom had followed in his car, came over to her and asked for further directions. He then opened her car door, grabbed her around the neck, threatened to kill her if she screamed, and got into her car, which he drove a few blocks and parked. Wisdom followed in defendant's car. Defendant took $3.25 from her purse and forced her to have intercourse with him. She did not physically resist him because he had threatened her with harm and she was afraid. He pushed her from her car into the back seat of his car and said to Wisdom, "You drive. You know the place." Wisdom drove them to the vicinity of the Hensley redevelopment tract, where defendant had intercourse with her in the back seat. He forcibly pulled some rings from her hand, which she told him were "only worth a hundred dollars." He asked Wisdom, who had remained in the front seat, if he wanted to have sexual relations with her, and Wisdom said, "No." After telling Wisdom to get into the rear seat, defendant drove back to Mrs. Dozier's car, and on the way she and Wisdom talked to each other. On arriving at her car defendant told Wisdom to let her out. She went home and told her husband she had been robbed, and he immediately summoned the police. She told them she had been raped and robbed.

Mrs. Dozier's husband testified that on her return home she was "hysterical," her dress was torn, her ring finger was bleeding, and her rings were missing.

Wisdom, called as a witness by the prosecution, testified as follows: He had been drinking and riding with defendant on the night in question. Defendant left his car to talk with Mrs. Dozier near a telephone booth, and when he returned they followed Mrs. Dozier to Sanford Avenue, where she parked. Defendant walked over to her car, talked to her for a short while, then got into her car, drove it a few blocks and parked again. Wisdom, who did not hear their conversation,

followed in defendant's car and parked behind them. He thought defendant and Mrs. Dozier remained in her car for half an hour to an hour, but he was not sure of the exact length of time because, after finishing a can of beer, he went to sleep, and he did not hear any conversation or other sounds from within Mrs. Dozier's car. He awoke when a train went by, and he saw Mrs. Dozier at the front door of defendant's car with defendant standing behind her. Defendant and Mrs. Dozier got into the back seat and talked. Wisdom paid no attention to their conversation and heard only the mention of "some kids, or something." Defendant did not ask Wisdom to drive or say anything to him but took the wheel himself and drove to the Hensley tract. After arriving there defendant got into the back seat. Wisdom did not see or hear "anything." He did not notice defendant pulling at her fingers, and did not hear her say, "It's not worth more than a hundred dollars" or, "It hurts," or hear any other conversation between her and defendant. Wisdom later got into the back seat with Mrs. Dozier. He did not remember having any conversation with her or noticing "anything about her hand."

The prosecution claimed surprise during the course of Wisdom's testimony and was permitted to impeach him by means of prior inconsistent statements he had made to the police following his arrest. There was uncontradicted evidence that these statements were involuntarily made as the result of pressures by the police. We will discuss later the contention that it was error to use these statements to impeach Wisdom.

Defendant took the stand in his own defense and testified to the following effect: He had seen Mrs. Dozier at a bar and various other places prior to the night in question. When he saw her coming out of a telephone booth, he asked her if she wanted to go "for a ride and have some fun." At first she said she did not have time, but as he started to walk away she said, "The kind of fun that you want to have, I have time for that." She told him to follow her and then drove to Sanford Avenue and parked. After stopping his car he walked over to hers. She was sitting behind the wheel with her dress pulled up above her knees. She asked him if he thought that "this was worth the price of a fifth of whiskey" and, when he agreed, she said they could not leave her car parked there because her husband might see it. Defendant then drove her car a short distance and parked. Wisdom. followed them and parked nearby. Defendant and Mrs.

Dozier talked for a few minutes, and she said she would feel more at ease if they got out of her car, because her husband might "show up." They went to defendant's car, and, after awakening Wisdom, who was intoxicated, defendant told him to get into the back seat. Defendant then drove the car to a deserted area near the Hensley tract, where he and Mrs. Dozier had sexual relations. He did not threaten or use any force on her, and he did not take her money or her rings. Wisdom was asleep in the front seat. She asked defendant for the money he had promised for the purchase of whiskey, and he told her that he had nothing but a 20-dollar bill and would have to get change somewhere. He then drove her back to her car and, when she got out, drove off without giving her anything.

On cross-examination defendant testified that, although he had seen Mrs. Dozier before September 30, 1961, he had not talked to her, that he did not recall her saying her name was Mamie Dozier on the night in question, and that he had never heard any other name used in connection with her. He was then asked if he had made a statement to the police after his arrest, and he admitted having done so. He said it was possible he told the police he knew Mrs. Dozier as "Mary Alyce," but did not think he told them that he had previously had meetings and sexual relations with her. After defendant had concluded his testimony the prosecution placed a police officer on the stand who testified defendant told the police following his arrest that he had known Mrs. Dozier under the name "Mary Alyce" and that they had frequently met and engaged in sexual relations. The officer further testified that defendant admitted engaging in a sexual act with her on the night in question, although he denied using any force or taking her money or rings.

Defendant was recalled to the stand and testified that it was not true that he had previously had relations with Mrs. Dozier. He admitted making the statement testified to by the police officer, but said he had done so because he was physically exhausted from lack of sleep after the police had repeatedly awakened him during the night and told him to stand. As a further explanation of why he made the statement he said that he had a piercing headache, not only because of the loss of sleep but also because at the time he was apprehended he had been physically abused by members of Mrs. Dozier's family who had hit or kicked him about the head. He also said he made the statement because the police

"had been reading the Lindberg Act to me, and stating that if I did not say the exact thing that was on this complaint the lady signed . . . officer Davis said that he personally would see that I was escorted to the gas chamber."

The prosecution "must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." (*Rogers* v. *Richmond,* 365 U.S. 534, 540-541 [81 S.Ct. 735, 5 L.Ed.2d 760, 766-767] ; see also *Shotwell Mfg. Co.* v. *United States,* 371 U.S. 341, 348 [83 S.Ct. 448, 9 L.Ed.2d 357, 364].)

And it is uniformly held that involuntary confessions are inadmissible as affirmative evidence not only because they are untrustworthy but also because it offends the community's sense of fair play and decency to convict a defendant by evidence extorted from him and because exclusion serves to discourage the use of physical brutality and other undue pressures in questioning those suspected of crime. (*People* v. *Berve,* 51 Cal.2d 286, 290, 293 [332 P.2d 97] ; cf. *People* v. *Ditson,* 57 Cal.2d 415, 437 et seq. [20 Cal.Rptr. 165, 369 P.2d 714].) As said in *Spano* v. *New York,* 360 U.S. 315, 320-321 [79 S.Ct. 1202, 3 L.Ed.2d 1265, 1270], "The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves." These same principles have been held in this and a growing number of other jurisdictions to require the exclusion of an accused's involuntary *admissions* where they are sought to be used as affirmative evidence. (*People* v. *Atchley,* 53 Cal.2d 160, 169-170 [346 P.2d 764] ; *Ashcraft* v. *State of Tennessee,* 327 U.S. 274, 278-279 [66 S.Ct. 544, 90 L.Ed. 667, 669-670] ; 3 Wigmore, Evidence (3d ed. 1940) § 821 [1962 Supp. pp. 87-88].)

It is also established in California and many other jurisdictions that involuntary *confessions* may not be used for purposes of impeaching the testimony of an accused. (*People* v. *Byrd,* 42 Cal.2d 200, 210 [266 P.2d 505] ; *People* v. *Rodriguez,* 58 Cal.App.2d 415, 418 et seq. [136 P.2d 626] ; see *People* v. *White,* 43 Cal.2d 740, 745 [278 P.2d 9] ; 89 A.L.R.2d 478, 479-480.) We believe a similar rule should operate to exclude involuntary *admissions* when they are offered for that purpose, and it has been so held in a

number of jurisdictions. (*People* v. *Hiller,* 2 Ill.2d 323 [118 N.E.2d 11, 13] ; *State* v. *Palmer,* 232 La. 468 [94 So.2d 439, 444-445] ; *State* v. *Burnett,* 357 Mo. 106 [206 S.W.2d 345, 347-348] ; see 89 A.L.R.2d 478, 479.) ▮▮ The credibility of an accused who takes the stand may be of critical importance to the trier of fact in determining whether or not a defense has been established, and we should not permit an accused's credibility to be attacked by use of an involuntary statement which would be inadmissible as affirmative evidence under the rule of *People* v. *Atchley, supra,* 53 Cal.2d 160, 170.

▮▮ Before confessions or admissions may be used against a defendant the prosecution has the burden of showing that they were voluntary and not the result of any form of compulsion or promise of reward, and it is the duty of a reviewing court to examine the uncontradicted facts in order to determine independently whether the statements were voluntary. (*People* v. *Trout,* 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418] ; *People* v. *Berve, supra,* 51 Cal.2d 286, 290-291; see *People* v. *Atchley, supra,* 53 Cal.2d 160, 170; *People* v. *Nagle,* 25 Cal.2d 216, 222-223 [153 P.2d 344].)

▮▮ The uncontradicted testimony of defendant as to the circumstances under which his statement was given to the police shows that the statement was the product of threats and coercion. The part of the statement declaring that he had engaged in a sexual act with Mrs. Dozier on the night in question was an acknowledgment of an important incriminating fact. ▮▮ Although the receipt of this admission into evidence could not be said to have damaged him since he had already testified to the same fact at the trial, a different situation is presented with respect to his assertion to the police that he had frequently met and engaged in sexual relations with her. ▮▮ A prior statement, although exculpating in form, may prove highly incriminating at the trial because, upon a showing of its falsity, it can constitute evidence of consciousness of guilt. (See 3 Wigmore, Evidence (3d ed. 1940) § 821, pp. 241-242.) ▮▮ According to Professor Wigmore, prior inconsistent statements by a *party* that are sought to be used against him at trial need not have been against interest when made (see 4 Wigmore, Evidence (3d ed. 1940) § 1048, p. 2 et seq.), and it would seem clear, as indicated in *People* v. *Atchley,* 53 Cal.2d at page 170, that any statement by an accused relative to the offense charged can constitute an admission within the operation of the prin-

ciples set forth above regarding the admissibility of involuntary statements. (See Uniform Rules of Evidence 63 (6).)

 We are satisfied that defendant was seriously damaged by the inadmissible evidence of his assertion concerning his prior relations with Mrs. Dozier. That assertion was designed to make it appear that his sexual act with her on the night in question was but one of a series of such acts willingly engaged in by her, and, since the statement was false, as defendant himself acknowledged at the trial, it was reasonable to expect that the jury, unless instructed otherwise, would view that statement not only as impeaching him but also as affirmative evidence of guilt. The jury was not instructed to disregard his statement nor was the jury informed that the uncontradicted evidence of its involuntariness could affect their consideration of the statement. On the contrary, the jury was instructed *without qualification* that where an attempt is made to impeach the defendant by prior inconsistent statements such evidence may be considered not only for the purpose of testing his credibility but also along with all other evidence in determining his guilt or innocence. Although this instruction is correct as a general proposition of law (*People* v. *Wein,* 50 Cal.2d 383, 403-404 [326 P.2d 457]), it should not have been given without qualification in the present case, since the evidence showed that defendant's prior statement to the police was involuntary. The use of his statement, whether as an attack on his credibility or as proof of consciousness of guilt, was particularly damaging in view of the sharp conflict in the evidence bearing on the issue of guilt.

We come now to defendant's claim that it was error to permit the prosecution to impeach Wisdom's testimony. Wisdom, as we have seen, was called as a witness by the prosecution, and the district attorney claimed surprise when Wisdom testified that defendant was the one who drove the car to the Hensley tract. Proceedings were then had in the absence of the jury, and it was shown during those proceedings that Wisdom had told the police when interrogated following his arrest that he, Wisdom, had been the driver. It was also brought out that he had made several other statements to the police as to what had happened after reaching the Hensley tract. Wisdom testified during the proceedings out of the jury's presence that his extrajudicial statements were false and were the result of police threats, and he also indicated that if questioned as to what happened after reaching the

tract he would give testimony inconsistent with his prior statements to the police. After some discussion between the court and counsel defendant's attorney stated he was satisfied the prosecutor was surprised by Wisdom's testimony.

The jury was then recalled, and the prosecutor questioned Wisdom as to what he had seen or heard at the Hensley tract and elicited the testimony on that subject set forth above. The prosecutor then impeached Wisdom by proving that he had made prior statements to the police which were inconsistent with his testimony. In response to the prosecutor's questions Wisdom admitted telling the police that he had seen Mrs. Dozier holding out her hand while she was in the car at the Hensley tract, that she was crying, that he knew she "was hurting," that when she said "it" was not worth over a hundred dollars she must have been referring to her ring, and that the ring was "skintight" and she had said, "Lord have mercy. I wish they would come off."

After Wisdom had admitted making the statements the prosecutor again claimed surprise and asked permission to play to the jury a tape recording of the police interrogation, but the court refused permission on the ground that Wisdom had already admitted making the statements (see *People* v. *Sykes,* 44 Cal.2d 166, 172 [280 P.2d 769]). The prosecution next questioned Wisdom as to whether, subsequent to the interrogation by the police, he had given a written statement to a probation officer in which he had said something about "the rings" and the events after he got into the back seat of defendant's car, including the remarks Mrs. Dozier had made at that time. Wisdom testified that he did not remember, and the prosecutor then read the following from a document which so far as appears was not shown to Wisdom: "She was lying down in the back seat, and then she got up. As O'Neal was the driver, he said, 'Do you want some of her?' I said, 'No.' And the lady was holding onto my hand. And she was saying something about, 'Oh, don't let him hurt me anymore.' Or something like that." The prosecution asked Wisdom whether he had written the quoted statement, and Wisdom replied that he did not remember. No evidence was introduced by the prosecution that Wisdom had made the statement.

It is apparent that the prosecution, in questioning Wisdom regarding prior statements, was seeking to impeach his earlier testimony rather than to refresh his recollection. A party may, of course, impeach his own witness by the use of prior

124

inconsistent statements where he has been damaged and sur- prised by the witness' testimony (People v. Kidd, 56 Cal.2d 759, 765-767 [16 Cal.Rptr. 793, 366 P.2d 49]; People v. LeBeau, 39 Cal.2d 146, 148 [245 P.2d 302]), but it seems clear that the prosecution was not surprised by the testimony relating to occurrences after arrival at the Hensley tract which it adduced from Wisdom on resumption of direct ex- amination, since he had previously indicated during the pro- ceedings out of the jury's presence what testimony he would give. We need not dwell on this aspect of the case, however, because we are of the view that error was committed in the impeachment of Wisdom by statements which, according to the uncontradicted evidence, were involuntary.

Wisdom, in testifying that his prior statements were "forced on" him, said that he was intoxicated when he was interrogated by the police, that he was then in custody as a suspected accomplice to the crimes of rape, robbery, and kid- naping, and that at least two or three times before he made the statements to the police an officer had made threats that he would receive punishment of 20 years "for each count." The officer also said that he wondered "how I would look with grey hair," and he used "foul language towards me." Wisdom said that the police read a "book" to him about how he was "going to get the gas chamber," and "kept talking" to him "about the gas chamber." The prosecution did not introduce any evidence to show that the statements to the police were voluntary, that the conduct of the police testi- fied to by Wisdom did not occur, or that this conduct did not continue to act on him at the time he was interviewed by the probation officer.

 The same policy considerations which preclude the use of an involuntary statement of a defendant require that the prosecution be precluded from impeaching any witness by the use of an involuntary statement given as the result of pressures exerted by the police. Such a statement by a wit- ness is no more trustworthy than one by a defendant, its admission in evidence to aid in conviction would be offensive to the community's sense of fair play and decency, and its exclusion, like the exclusion of involuntary statements of a defendant, would serve to discourage the use of improper pressures during the questioning of persons in regard to crimes.

 Wisdom, because of his youth and his detention as a suspected accomplice, was undoubtedly susceptible to the exertion of pressures by the police, and his testimony that

there were such pressures and that his statements resulted therefrom stands uncontradicted. Again, as in the case of defendant's prior statement, the trial court did not instruct the jury to disregard Wisdom's extrajudicial statements or suggest that the question of voluntariness could affect the consideration of those statements. Instead the jury was instructed *without qualification* that it was permissible to consider prior inconsistent statements of a witness for purposes of testing his credibility. Although this instruction is, of course, correct in the usual case (see *People* v. *Orcalles,* 32 Cal.2d 562, 572 [197 P.2d 26]), it should not have been given here without qualification in view of the evidence that Wisdom's prior statements were involuntary.

The People, citing *People* v. *Perez,* 189 Cal.App.2d 526, 534 et seq. [11 Cal.Rptr. 456], assert that the prosecution would not have been permitted to rebut Wisdom's testimony on the issue of voluntariness. That case contains language to the effect that where a witness explains that a prior statement was involuntary it is error to admit evidence to rebut his explanation. As authority for this view the court relied in part on a statement in Wigmore that the exclusion of evidence regarding the correctness of an explanation would seem to be usually required by ''convenience,'' but Wigmore makes this observation as to explanations generally, without any mention of those based on improper police pressures. (See 3 Wigmore, Evidence (3d ed. 1940) § 1046, pp. 739-740.) Testimony of a material witness that statements by which he is sought to be impeached were the result of improper police pressures is a matter of serious concern, giving rise to an unusual situation in which an opportunity to rebut should not be foreclosed on the ground of convenience. The police certainly should have an opportunity to refute such a charge. The language to the contrary in *Perez* is disapproved.

The evidence as to guilt was sharply conflicting, and, when the harm to defendant resulting from the combined effect of the errors concerning his and Wisdom's prior statements is taken into consideration, we are satisfied that there has been a miscarriage of justice and that the judgment must be reversed. The errors not only undermined the trustworthiness of testimony by defendant and Wisdom which was vital to the defense but also permitted consideration of defendant's prior statement as affirmative evidence of consciousness of guilt. The prosecution's case was based largely

on the testimony of Mrs. Dozier. The credibility of defendant's testimony in opposition to her story was of critical importance in the outcome of the case. The testimony of Wisdom was inconsistent with her testimony in various respects and, taken as a whole, was of such a nature that it was to defendant's advantage to have that testimony remain unimpeached.

Although defendant's attorney did not make a sufficient and timely objection to the introduction of defendant's prior statement or to the examination of Wisdom regarding the statements which were inconsistent with his testimony, we are not prevented from reviewing the errors on appeal. As we have seen, special policy considerations preclude the use of involuntary statements, the evidence was uncontroverted that the prior statements of defendant and Wisdom were coerced, and the cumulative effect of the errors was prejudicial.

The judgment is reversed.

Traynor, J., Schauer, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.