2 Ill. App.3d 324 (1971)
276 N.E.2d 782
THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee,
v.
LORENZO B. BACON, Defendant-Appellant.
No. 53810.
Illinois Appellate Court  First District.
October 29, 1971.
*325 *326 Gerald W. Getty, Public Defender, of Chicago, (James N. Gramenos, James L. Doherty, and John L. Barton, Assistant Public Defenders, of counsel,) for appellant.
Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle, and Roger S. Matelski, Assistant State's Attorneys, of counsel,) for the People.
Reversed and remanded.
Mr. JUSTICE LORENZ delivered the opinion of the court as modified on rehearing:
A jury found the defendant guilty of the offenses of attempted murder and aggravated battery. He was sentenced to terms of fourteen to twenty years and eight to twelve years respectively. The finding and sentence with respect to the aggravated battery charge were subsequently vacated.
On appeal, defendant contends: (1) that the trial judge erroneously denied defense motion for discharge under the statute requiring trial within 120 days of arrest; (2) that the court erroneously permitted the State under guise of impeachment, to place before the jury as substantive evidence, statements by defendant's co-indictees implicating defendant in the crime charged; (3) that the denial of defense motion for a hearing to determine the voluntariness of those statements was improper; (4) that statements elicited from defendant were in violation of the principles established by the Supreme Court in Miranda v. Arizona (1966), 384 U.S. 436 and should therefore have been suppressed; (5) that certain physical evidence was the fruit of a statement elicited from the defendant in violation of the Miranda doctrine and should therefore have been suppressed; (6) that the trial court erred when it failed to make findings of fact and law upon denying defense motions to suppress; (7) that the trial court should not have allowed the State to introduce evidence of crimes other than the one for which defendant was being tried; (8) that defendant was denied a fair trial; and (9) that the giving of an instruction relating to the credibility of defense witnesses was improper.
The State's evidence in its case in chief may be summarized. At approximately 10:00 A.M. on October 23, 1967, Police Sergeant Rourke was driving his marked squad car in a southerly direction on south Halsted *327 Street in Chicago. He observed an automobile slide through a stop sign. The driver of that car was signaled to pull to the curb and the three occupants were ordered out of the car. They were brought to the rear of their car where they were patted down. The men were then told to remain at the rear of the car. While Rourke was calling for assistance two of the men left their positions. At Rourke's command one returned but the other, identified by Rourke as defendant, kept walking to the passenger side of the car. Defendant then fired a shot which struck Rourke in the lower abdomen. Rourke returned the fire wounding one of the three. The trio fled the scene in their car. Another police officer, coming upon the scene moments later, attempted to follow the fleeing trio. He found their car abandoned. Crime laboratory technicians lifted fingerprints from the car which were established to be those of defendant.
The State Police arrested defendant at Farmer City, Illinois, and took him to Pontiac, Illinois, to await the arrival of the Chicago police. When the Chicago police arrived in Pontiac they searched defendant and informed him of his rights in regard to questioning. Defendant stated that he did not want to say anything and he was not interrogated. He was then placed in the rear seat of a police car for the return trip to Chicago. On returning to Chicago they went directly to Area Two Police Station where Sergeant Murtaugh took command of the investigation. When Murtaugh informed defendant of his rights, defendant responded that he understood. Defendant requested permission to telephone his father. The police then provided a telephone which defendant used in an unsuccessful attempt to reach his father. Defendant then told the police that he would like to call an attorney whom he knew. The police gave defendant a telephone directory but he was also unsuccessful in his attempt to contact the attorney.
Defendant was then taken to another police station for a line-up. There he again tried unsuccessfully to contact his father. Although no interrogation took place at this station, defendant overheard the police officers mention the names of defendant's co-indictees, Pillow and Turner. Defendant then asked whether the others involved in the case were in custody. On being informed that they were, he asked for the man in charge of the investigation because he wanted to "tell it like it was." Murtaugh was summoned and once again informed defendant of his rights. After a reading of the four warnings defendant responded that he understood. He then made a statement implicating himself as the person who shot Rourke.
The police took defendant to Rourke's room in Little Company of Mary Hospital where defendant said "That's the sergeant I shot." *328 Rourke then identified defendant as his assailant. Defendant was then taken to a third police station for processing. There he was asked by Murtaugh whether he had anything else to say. Defendant said he would show the police where the gun could be found. He then led the police to a clump of bushes in an alley where the gun was discovered. Several police officers testified that during the entire time defendant was in custody he made no attempt to escape and he was not physically abused.
The evidence presented by defense may be summarized. On October 23, 1967, defendant arrived home at approximately 8:00 A.M. He received a telephone call from his father at 8:30 A.M. and defendant called his friend Ollie Ross at 9:30 A.M. He made arrangements to meet Ross later than morning. Defendant went to the dry cleaner and on his return trip met Mattie Bell with whom he had a brief conversation occurring about 10:00 or 10:15 A.M. He arrived home about 10:30 A.M. As he was entering the building his father arrived. They talked of defendant's upcoming trip to see his mother in Wichita. At 11:00 A.M. defendant kept his previously arranged meeting with Ollie Ross. While they were having a drink Ross told defendant that Pillow had been wounded. At 3:00 P.M. defendant boarded a bus for Wichita. As he stepped off the bus for a bite to eat at Farmer City, Illinois, he was apprehended and searched by the State Police. He was taken to Pontiac where the Chicago police came for him. The Chicago police unsuccessfully attempted to persuade defendant to make a statement. On the return trip to Chicago defendant was punched repeatedly by the officers.
They arrived at a Chicago police station about 2:45 A.M. on the morning of October 24, 1967. There defendant met Murtaugh, who jabbed defendant in the stomach with a pistol after he asked to call his attorney. While at the first police station defendant was not allowed to make any telephone calls. He was taken to another police station where he was beaten, placed in a line-up, and then beaten again. Once more he unsuccessfully requested permission to call an attorney or his father. The police than transported defendant to the hospital in which Rourke was recovering. There, Rourke identified defendant as the man who shot him. Defendant was taken to yet a third police station where he was photographed and fingerprinted. Murtaugh then placed defendant in a car which transported them to an alley where another police car was awaiting them. There he was instructed to pick up a gun.
When defendant's father arrived home from work on the afternoon of October 23, 1967, he was met by the police who had already searched the home. They told him that his son had shot a policeman. Bacon, Sr. advised the police that his son was on the way to Wichita. After some of the police left he telephoned a friend and asked her to come to his house. *329 The friend arrived at 6:00 P.M. and stayed throughout the night. They were awake all night talking. The telephone never rang after midnight.
Although Pillow and Turner made statements to the police naming defendant as Rourke's assailant, at trial they named another as the person who shot Rourke. They indicated that the previous statements were involuntary and were the product of police persuasion.
The State introduced rebuttal evidence to impeach the testimony of Pillow and Turner. This is set forth in detail below.

Opinion
(1) Defendant contends that he was entitled to discharge under Ill. Rev. Stat. 1967, ch. 38, par. 103-5.[*] The basis of this contention is his assertion that he occasioned no delay from March 5, 1968, to the time of trial, August 1, 1968. We are unable to agree with him in this regard.
On February 26, 1968, defendant filed a motion for the substitution of judges naming Judges Wilson and Delaney as judges who, in defendant's belief, were prejudiced against him. A hearing on that motion was conducted on March 5, 1968, at which time the motion was allowed and the cause transferred to Presiding Judge Power for re-assignment. On that same day, March 5, 1968, leave was granted defendant to amend his motion deleting Judge Delaney's name and inserting the name of Judge Heilingoetter as one who defendant feared was prejudiced against him. Defendant's motion was allowed and the case was then assigned to Judge Delaney. On April 5, 1968, the parties appeared before Judge Delaney for a hearing on a motion to suppress a confession. The assistant state's attorney called the judge's attention to the fact that he was originally named in defendant's petition for substitution. The State then sought to have defendant acknowledge that he did not consider Judge Delaney prejudiced against his cause. Defense counsel responded by informing the court that defendant did not wish to be tried by Judge Delaney. Defendant, himself, spoke out saying, "I am requesting a substitution of judges." The motion was granted and on that same day the case was re-assigned to Judge McMillen who continued the case until July 15, 1968. Because the case was assigned to Judge McMillen on the same day the second motion for substitution of judges was made, defendant would have us believe that any delay which occurred during the period in *330 question was not occasioned by him but was the result of administrative inefficiency of the court system.
This court was faced with a similar contention in People v. Walker (1968), 100 Ill. App.2d 282, 289. There on motion of defendant for a substitution of judges the case was re-assigned the same day to the eventual trial judge. The defendant contended that his motion did not cause or contribute to delay in the proceedings. The court, however, did not agree with him and held that defendant's action substantially contributed to the delay of which he complained on appeal and therefore he could not bring himself within the rule even though that delay was administrative in nature.
 1 We hold the delay in the present case attributable to defendant. It was his second motion for substitution of judges which generated the delay until July 15, 1968. The 120 day period started again from that date and ran to a date well beyond the date of trial in this case. See People v. Jones (1968), 101 Ill. App.2d 423, 428-429.
 2,3 The trial court had further grounds for refusing to discharge defendant under the 120 day rule. On July 19, 1968, defense counsel moved for a Behavior Clinic examination of defendant. The court then continued the case until July 23, 1968. Any delay occasioned by an examination of defendant for competency tolls the statute. (Ill. Rev. Stat. 1967, ch. 38, par. 103-5.) It is clear that the purpose of the continuance granted on July 19, 1968, was to enable defendant to be examined by the Behavior Clinic pursuant to defendant's motion for such examination. The court below properly denied defendant's motion for discharge.
(2) In defendant's next contention he asserts that the trial court erred in allowing the prosecution to introduce, under the guise of impeachment, statements made by defendant's coindictees implicating defendant in the crime charged.
Ronald Turner and Richard Pillow, both of whom were then serving terms in the penitentiary for convictions arising out of the same series of events for which defendant was being tried, testified that it was not defendant but Earl Winston who shot Officer Rourke. Both Turner and Pillow admitted giving statements to the police on the day of their arrest, but testified that the statements were the result of coercion and highly suggestive tactics by the police. On cross-examination of both witnesses, the prosecution, over objection by defense counsel and on a question by question basis, brought out inconsistencies between their testimony and their extra-judicial statements. Although those prior statements were of considerable length, Turner's consisting of ninety-eight questions and answers and Pillow's consisting of seventy-seven, the cross-examination of both witnesses involved a seriatim inquiry into whether each and *331 every question of the witness' respective statement was asked of and answered by him. Those statements revealed that prior to the trial of this cause Pillow and Turner said that defendant was with them on October 23, 1967, when they drank and committed an armed robbery, and that it was defendant who shot Rourke. The jury, while being apprised that Pillow and Turner had previously stated defendant shot Rourke, was not, however, informed that those prior statements could only be considered for purposes of determining the credibility of those witnesses. The State's Attorney's reporter who transcribed Pillow's statement was called in rebuttal by the State and examined as to whether some thirty-five questions and answers had been asked of and answered by Pillow. Although those questions and answers also clearly indicated to the jury that Pillow had previously named defendant as the person who shot Rourke, no limiting instruction was given to the jury. An assistant state's attorney was also called in rebuttal and testified that Turner had told him that defendant was present when Rourke was shot, and, as before, the jury was never instructed concerning the limited purpose of impeachment for which those statements were received. Additionally, the written jury instructions contained no caution to the jury concerning the use of those statements.
The Supreme Court looked unfavorably upon a situation similar to the instant case in People v. Barragan (1929), 337 Ill. 531 where a witness testified that he committed the crime and defendant was not present. Purportedly for purposes of impeachment, the prosecution produced a statement made by defendant. As the prosecutor read a series of questions and answers from that statement, some of which indicated that defendant was with the witness during the perpetration of the crime, the witness was asked whether or not he made such answers. A police officer who transcribed the statement was also called upon to testify. He was asked whether certain questions and answers were asked of and answered by the witness. The court pointed out that though the statements were offered for the purported purpose of impeachment the real purpose was to present to the jury a statement that defendant participated in the crime. 337 Ill. 531, 536.
In People v. Tunstall (1959), 17 Ill.2d 160 another similar situation was presented to the court. There also the defense called a co-indictee of defendant to testify that defendant did not take part in the commission of the crime. On cross-examination it was brought out that the witness had made a statement on the day of his arrest wherein he implicated defendant. The prosecutor then proceeded to examine the witness as to each question and answer of that statement. There also the jury was not informed that the statement was to be considered by them only for the *332 purpose of determining the credibility of the witness. Because of that failure the jury was, in effect, allowed to look upon the statement as evidence of defendant's guilt. It was also clear that, even though the prosecution said the use of the statement was for the purpose of impeachment only, the prosecutor's action in bringing every detail of the statement to the attention of the jury indicated his desire to place before the jury a statement that defendant prepared for the crime, assisted in its commission and shared in its spoils.
In People v. Tate (1964), 30 Ill.2d 400 a co-indictee testified that he alone was responsible for a crime. The prosecution then cross-examined the witness on a statement he gave to the police wherein he implicated the defendant as the person who committed the crime. There the court determined that the trial judge erred in failing to admonish the jury that the statement should be considered by them only with respect to the credibility of the witness in spite of the fact that no such instruction was requested by defense counsel. (Accord, People v. Paradise (1964), 30 Ill.2d 381, 385.) In Barragan, Tunstall, Paradise and Tate convictions were reversed and new trials granted.
 4 In our consideration of the instant case we hold that it was error for the trial judge to fail to give an instruction to the jury concerning the limited purpose for which the statement was to be considered by them. The necessity for such instruction is amply demonstrated by the language of the Supreme Court in People v. Tate, supra, where at page 404 it said quoting from People v. Tunstall, supra:
"Inasmuch as the jury was neither informed nor instructed that the statement could be considered only for the limited purpose of determining * * * credibility, * * * its introduction into evidence left the jury free to look upon it as further evidence of the defendant's guilt. If, from the competent evidence already admitted, the jury entertained any doubts that the defendant was guilty, it would be difficult, if not impossible, to remove the impression of guilt which would follow from such a statement."
 5, 6 We believe the trial judge also erred in allowing the prosecution to go beyond the realm of proper impeachment by bringing out every detail of the lengthy statements which not only implicated defendant in the crime charged but also in another crime thereby causing extreme prejudice to him. (People v. Paradise (1964), 30 Ill.2d 381, 385.) We, therefore, reverse the conviction of defendant and remand the case for a new trial. Let it be pointed out, however, that impeachment of a witness by the use of prior inconsistent statements is not prohibited, but where the jury is allowed to consider the extra-judicial statements as evidence of defendant's guilt because they were not instructed otherwise *333 or where, under the guise of impeachment, the prosecutor attempts to show defendant's guilt by use of those extra-judicial statements, it is improper.
(3) While it is unnecessary to consider any other of the contentions raised by the parties and as a result of the briefing on this appeal the same situations are not likely to arise again, attention should be given to some problems which are likely to recur on re-trial of this case.
 7, 8 The trial court should have conducted a hearing on defendant's motion to determine the voluntary nature of the statements used to impeach the testimony of defendant's co-indictees. The State would have us believe that defendant does not have standing to question the voluntary nature of a statement used by the State in an attempt to impeach defense's witness. This is contrary, however, to the principle developed in the following cases. In People v. Adams (1953), 1 Ill.2d 446, 451-452 the court stated that the use of a statement previously made by defendant for purposes of impeaching his testimony was improper when the question of the voluntary character of that statement was undetermined. In People v. Hiller (1954), 2 Ill.2d 323, 327 the court broadened the rule to include statements of co-defendants. As in People v. Tate (1964), 30 Ill.2d 400, 405 and People v. Newman (1964), 30 Ill.2d 419, 424, the court extended the rule to require the establishment of the voluntary character of out-of-court statements of witnesses who were not co-defendants when those statements were used, even for impeachment purposes. See discussion in Harris v. New York (1971), 401 U.S. 222.
The trial court, at the instance of the State, gave to the jury an instruction concerning accomplice witnesses. Because of the nature of such an instruction in singling out a particular witness for comment by the court as to his credibility, we are not fully convinced that such an instruction should be given in this case (on behalf of the State) or in the usual situation, on behalf of the defendant. In any event, the instruction given was unduly long, and imperfect in some respects, so, if the subject is to be covered by an instruction in the future, we assume it would be given in the form set out in I.P.I.  Criminal § 3.17.
The judgment is reversed and the cause remanded for a new trial.
Reversed and remanded.
ENGLISH, P.J., and DRUCKER, J., concur.
NOTES
[*] This statute provides:

"(a) Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, by an examination for competency ordered pursuant to Section 104-2 of this Act, by a competency hearing, by an adjudication of incompetency for trial, by a continuance allowed pursuant to Section 114-4 of this Act after a court's determination of the defendant's physical incapacity for trial, or by an interlocutory appeal."