**Peter F. LaFRANCE, Petitioner,**

**v.**

**George H. BOHLINGER, III, Superintendent, Massachusetts Correctional Institution at Norfolk, Respondent.**

**Misc. Civ. No. 72–134–T.**

United States District Court,
D. Massachusetts.

Oct. 9, 1973.

Alexander Whiteside, II, Putnam, Bell & Russell, Boston, Mass., for petitioner.

Bernard Manning, Asst. Atty. Gen., Boston, Mass., for respondent.

## OPINION

TAURO, District Judge.

Petitioner, an inmate at M.C.I. Norfolk, seeks a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. He has been confined following convictions in the Superior Court on indictments charging manslaughter, leaving the scene of an accident after causing personal injury, operating a motor vehicle

without a license and operating so as to endanger.

He is serving a term of four to six years on the manslaughter indictment. The other indictments were placed on file after trial. Petitioner unsuccessfully appealed his convictions to the Supreme Judicial Court of Massachusetts. Commonwealth v. LaFrance, 1972 Adv. Sheets 177, 278 N.E.2d 394.

The charges against the petitioner arose from an incident which occurred on October 6, 1970 at about 11:00 P.M. when one Paul Butler was struck and killed by an automobile. The facts and circumstances surrounding this incident are detailed in the Supreme Judicial Court's opinion. 1972 Adv.Sheets 177, 278 N.E.2d 394. By way of background it is sufficient to outline briefly certain events which occurred during the trial. These events will be discussed in greater detail as we analyze the legal issues presented by this petition.

A Richard Brown was called as a witness by the prosecution. Brown testified on direct examination that he had been with the petitioner at another's apartment at the time of the automobile accident in question. Following this testimony, the prosecutor showed Brown a typed statement which Brown acknowledged having signed on October 13, 1970 at the Taunton Police Station. In essence, the typed statement contradicted Brown's direct testimony concerning his and petitioner's whereabouts at or about the time of the October 6 automobile accident.

Over petitioner's objection and exception, the trial judge permitted the prosecutor to ask leading questions which essentially paraphrased the typed statement. Brown answered each of these questions in the negative, thereby refusing to recant his testimony as to where he and petitioner were on the night in question. Thereafter, the judge admitted the typed statement for the purpose of impeaching Brown's direct testimony.

During his direct examination, Brown stated repeatedly that the typed statement had not been made by him voluntarily. To the contrary, Brown testified that the statement was the product of suggestions and threats by the police at a time when he was suffering withdrawal from the use of drugs. The jury was present during the entire line of questioning involving this statement.

These events give rise to two contentions by the petitioner. The first is that by permitting the use of leading questions based on the contents of the typed statement, the truth of which Brown denied at trial, the trial judge deprived the petitioner of his right to be confronted by the witnesses against him in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution.

Petitioner's second contention is that the use of the typed statement as a factual basis for leading questions, and as a prior inconsistent statement, violated the petitioner's right to due process of law guaranteed by the Fourteenth Amendment. Petitioner's basis of contention is that the prosecution failed to establish, and the trial judge failed to make a preliminary determination in the absence of the jury, that Brown's statement to the police was made voluntarily.

A third contention, jurisdictional in nature, is that petitioner has exhausted his state remedies and, therefore, that his two substantive contentions are properly before this Court.

The Magistrate determined that petitioner had exhausted his available state remedies, but found no merit in his two substantive contentions and, therefore, recommended allowance of Respondent's Motion to Dismiss for failure to state a claim. For the reasons set forth below, we agree with the Magistrate's conclusions that petitioner has exhausted available state remedies, and that petitioner's first substantive contention involving confrontation is without merit. On the other hand, we do find merit in petitioner's second due process contention and, therefore, direct that a Writ of Habeas Corpus be issued under the

terms and conditions of the accompanying order.

## EXHAUSTION OF AVAILABLE STATE REMEDIES

With respect to exhaustion, we conclude that the issues now raised were before the Supreme Judicial Court, partially during oral argument and fully at pages twenty through twenty-seven of Defendant's Brief. The Supreme Judicial Court treated these issues as follows:

> Furthermore, there was no error in allowing the Commonwealth to introduce Brown's statement for impeachment purposes. [case cited] In compliance with the requirements of G.L. c. 233, § 23, the witness was fully apprised of the time, place, and content of the prior statement, and was given full opportunity to explain it. The jury were clearly instructed that they were to consider this only as affecting the witness's credibility. Also, in his charge the judge rather elaborately reemphasized what he had previously stated to the jury in this regard. In addition, other testimony was adduced outside the Brown statement which linked the defendant to the crime. This fact distinguishes this situation from those to which the defendant has called our attention in certain cited Federal cases. [cases cited]

Commonwealth v. LaFrance, 1972 Adv. Sheets 177, 180–181, 278 N.E.2d 394, 397 (Opinion by Justice Reardon).

## FACTUAL BASIS OF PETITIONER'S SUBSTANTIVE CONTENTIONS

A rather exhaustive exposition of the circumstances surrounding the witness Brown's testimony is a necessary prelude to a substantive analysis of petitioner's claims of constitutional error.

On direct examination, Brown testified that he had been with the petitioner at another's apartment in Taunton during the evening on which the automobile accident occurred, and that he and petitioner did not leave that apartment until 8:15 A.M. on the following morning. Tr. 136–140.

The prosecutor then inquired about a conversation which Brown had with the police on October 13, 1970. Brown testified that he was "taken down" to the Taunton police station at approximately 12:45 p. m., and at approximately 7:00 p. m. signed a statement which the police had typed out. Tr. 141–42. He testified that, prior to his signing, the police "said they didn't like something I said. And so, I wanted to go down myself, so I told them to put down what they wanted, and I would cross out anything, you know, or initial it." Tr. 143.

The trial judge then ordered Brown to approach the bench and, in response to the prosecutor's inquiry, Brown acknowledged his signature on the statement. Tr. 143. The prosecutor repeated his question as to whether Brown and petitioner had left the apartment that evening, and again Brown answered "No". Tr. 143–44. Brown denied that petitioner picked him up that evening at Andy's Market in "a dark-colored Chevrolet, four-door, hard-top sedan." Tr. 144.

Over petitioner's objection and exception, the trial judge ruled that he would allow leading questions. Tr. 145. The prosecutor then proceeded to paraphrase to the jury Brown's prior statement in the form of a series of leading questions. Tr. 146–47; see also Tr. 157–69. Brown was asked whether he knew the car was stolen; he answered that "there was no car." Tr. 145. Brown answered each of the following questions in the negative:

> Did you then go to Attleboro with Mr. LaFrance in the car? When you got to Attleboro, did you notice that the friend who you went to see, his mother was home? Did you notice that? And so that you didn't stop, and rode by the house a couple of times? Did you then head back towards Taunton, through Norton, by Union Road? Did you then pick up a hitchhiker either going to Attleboro or returning,

and drop him off at his home location, which is unknown to you? Did you then head towards Taunton? Did you then tell LaFrance that you wanted to get a road runner? Did you then go to sleep; and then realize that you had hit something? Did you then turn to LaFrance and say, "You just hit something." And did Pete reply to you, "Big fucking deal. I don't give a fuck"? Did you then turn down some streets which were not known to you, and come out by a cemetery at the Paul Dever School? Did you go through the school grounds and come out on Bassett Street? Did you then go down Bay Street and have Pete drop you off at Carlo's Cafe on Whittenton Street? Did you get out of the car there and go over to Joey's, because that is where you woke up the next morning? Tr. 146–47. Brown then again asserted that he had been with petitioner "all that night." Tr. 148.

Over petitioner's objection and motion to strike Brown's testimony, the trial judge ruled that the prior statement could be used to impeach Brown's testimony. Tr. 148–49.

Before impeaching Brown with the statement, the prosecutor asked him, in the presence of the jury, if the statement was given of his "own free will, after having been advised of [his] rights", and Brown answered "No." Tr. 149–50. Brown then testified that he was threatened that night by police officer Dale Clark who said several times that "if it took a million years, he [Clark] would see [Brown] swing for this." Tr. 150–51. Brown asserted that he had not provided all the information that appeared in the signed statement, Tr. 153–54, but rather had told the police that night that "anything they wanted to type down there they could type to their heart's content, and I [Brown] would sign it so I could go back to myself", Tr. 160, and that "whatever they said, I would agree with it." Tr. 153.

Brown explained his prior statement, the truth of which he denied in court, Tr. 136 et seq., by noting:

That day that I got arrested, I was doing dope that day, too, and they kept me up there; you know, they kept asking me. So, after a while . . . my mind was going crazy. I told [the police] anything they said. They just kept asking me the same questions over and over. I told them I would say anything, just to get back to myself.

Tr. 155–56.

Later in response to the judge's direction to "give the jury any explanation you want to about that statement . . . .", Brown testified:

The day that they picked me up to make this statement, it was about one o'clock, and I was brought to the Taunton Police Station. And just before they picked me up, I had somemore "dollies". I had about seven; and they came down and they questioned me for awhile.

And then the Taunton cops took me out, took a car and took me through the woods to see if they could find the car.

They didn't find anything, so they brought me back; and then the Norton cops were talking to me again. And they kept me up there; and I said I didn't want to talk anymore; I wanted to go back to my cell. I was getting real nervous and everything, you know, because it was getting late.

And, so, after awhile my mother and father came, and I told them to tell the cops to leave me alone; I didn't want to talk with them until I saw a lawyer.

My mother and father told them they didn't want me to do anything until I saw a lawyer. So the cops promised them that they would take me back to the cell after my mother and father left.

My mother and father left, and they still kept me up there.

I just got out of Bridgewater, and I was real nervous, doing the "dollies" and everything. And they just made me nervous. Man, I was scared.

They said they weren't going to let me go back down to my cell until I made that statement. They said they were going to charge me with it; and then I kept telling them I didn't want to talk anymore.

They kept saying that; so, after awhile, I was starting to crack up. I didn't want to come back to Bridgewater, because that is nasty there.

They said if I would sign it, they would let me go back to my cell. So I did.

Tr. 173–74.

All of Brown's testimony took place in the presence of the jury. The judge instructed the jury that "this [impeachment] testimony goes to the credibility that you will attach to [Brown's] story", Tr. 150, and is not itself substantive evidence. Tr. 178–79.

After the testimony of Brown, the Commonwealth called Officer Dunlap, a policeman who had been present at Brown's questioning. On objection to Dunlap's testimony, defense counsel inquired whether it was being offered only to impeach Brown and the trial judge answered "yes; corroboration." Tr. 181.[1]

Dunlap then testified that on the day Brown had made the statement to the police, he "appeared apparently normal" compared with the only other time he had seen Brown, Tr. 181, and that the statement contained all of the information that Brown gave the police. Tr. 183. Dunlap noted that after the statement was typed, "I read the statement to him to make sure he understood it before he signed it." Tr. 183.

Bernard Hanrahan, an investigator for the Registry of Motor Vehicles who was present during Brown's questioning, testified for the Commonwealth that "Brown broke down and shook and wept" under the questioning. Tr. 212.

Neither Dunlap nor Hanrahan contradicted Brown's assertion that he had been threatened repeatedly by Officer Clark. And Clark himself, who had testified previously, see Tr. 43 et seq., was not called to rebut Brown's allegations.

The defendant took the stand and testified that he and Richard Brown spent the entire night of October 6, 1970 in an apartment and did not leave until the following morning. Tr. 220 et seq.

## PETITIONER'S CONFRONTATION CONTENTION

Petitioner contends first that he was deprived of his right to confront the witnesses against him, U.S.Const. amend. VI, XIV, when the prosecution was permitted to put before the jury the contents of Brown's out-of-court statement, the truth of which was denied by Brown at trial.

The petitioner "relies upon a rule similar to that enunciated in Bruton v. United States, 391 U.S. 123 [,88 S.Ct. 1620, 20 L.Ed.2d 476]." Petitioner's Memorandum of Law, at p. 3. In Bruton, there was testimony at a joint trial of an oral confession given by the co-defendant which implicated Bruton in the robbery. The trial judge limited this evidence to the case against the co-defendant and instructed that it was inadmissible against Bruton. The co-defendant did not take the stand. The Supreme Court held that "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of [the co-defendant's] confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth

---

1. After the Commonwealth's examination of Officer Dunlap was completed, the defense counsel moved that the jury be instructed that this portion (that which followed the testimony of Brown) of Officer Dunlap's testimony was only to be considered for purposes of impeaching Brown's credibility; the defendant's exception was saved to the trial court's decision to "let [the testimony] stand". Tr. 184.

Amendment." 391 U.S., at 126, 88 S.Ct. at 1622.

The Court emphasized:

The unreliability of [accomplice] evidence is intolerably compounded when the alleged accomplice, as here, *does not testify and cannot be tested by cross-examination.*

391 U.S., at 136, 88 S.Ct. at 1628 (emphasis supplied).

Plainly, the introduction of [the co-defendant's] confession added substantial, perhaps even critical weight to the Government's case in a form not *subject to cross-examination, since [the co-defendant] did not take the stand.* Petitioner thus was denied his constitutional right of confrontation.

391 U.S., at 127–128, 88 S.Ct. at 1623 (emphasis supplied).

Petitioner places further reliance on Douglas v. Alabama, 380 U.S. 415, 85 S. Ct. 1074, 13 L.Ed.2d 934 (1965). In *Douglas,* two persons, Lloyd and Douglas, were tried separately for assault with intent to murder. Lloyd was tried first and convicted. At Douglas' trial, the state called Lloyd as a witness. Although Lloyd invoked the privilege against self-incrimination, the prosecutor was permitted to treat him as a hostile witness and questioned him by asking him to confirm or deny statements read from a document purported to be Lloyd's confession. These statements incriminated Douglas. Lloyd refused to answer each question. The Supreme Court held that Douglas' inability to cross-examine Lloyd as to the alleged confession denied him the right of cross-examination guaranteed by the Confrontation Clause. 380 U.S., at 419, 85 S.Ct., 1074. The Court concluded that the opportunity to cross-examine the law enforcement officers regarding the confession's genuineness was inadequate to redress the deprivation of cross-examination of Lloyd to test its

truth. 380 U.S., at 419–420, 85 S.Ct. 1074.

■ Petitioner's reliance on *Bruton* and *Douglas* is clearly misplaced. These cases involve incriminating out-of-court statements by declarants who were unavailable for cross-examination by the defendant at trial. At petitioner's trial, however, the out-of-court declarant (Brown) took the stand, asserted no privilege, and was available for "full and effective cross-examination" (see California v. Green, 399 U.S. 149, 158, 90 S. Ct. 1930, 26 L.Ed.2d 489) by defendant's counsel.[2] Petitioner was thus not denied his right of confrontation.

The critical significance of this opportunity to cross-examine the declarant has been underscored by the United States Supreme Court. In Nelson v. O'Neil, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), the Court stated that the "confrontation" guaranteed by the Sixth and Fourteenth Amendments, and interpreted by *Bruton, supra,* is "confrontation *at trial*—that is, that the absence of the defendant at the time the co-defendant allegedly made the out-of-court statement is immaterial, so long as the declarant can be cross-examined on the witness stand at trial." 402 U.S., at 626, 91 S.Ct. 1723, 1726.

Emphasizing that *Bruton* was a situation in which the co-defendant declarant did not take the stand, the Court reaffirmed its observation in California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489, that:

"[T]here is good reason to conclude that the Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." *Id.,* at 158, 90 S. Ct. at 1935. Moreover, "where the declarant is not absent, but is present to testify and to submit to cross-examination, our cases, if anything, support

---

2. Defense counsel chose not to cross-examine Brown. See Tr. 179.

the conclusion that the admission of his out-of-court statements does not create a confrontation problem." *Id.,* at 162, 90 S.Ct. at 1937.

402 U.S., at 626–627, 91 S.Ct. at 1726.

The Constitution "is violated *only* where the out-of-court hearsay statement is that of a declarant who is unavailable at the trial for 'full and effective' cross-examination", 402 U.S., at 627, 91 S.Ct. at 1726. The declarant in the instant case was not unavailable. Petitioner, therefore, has suffered no deprivation as to his right of confrontation.

## PETITIONER'S DUE PROCESS CONTENTION

Petitioner's second contention attacks the prosecution's permitted use of the witness Brown's typed statement as a factual basis for leading questions and as a prior inconsistent statement without there having been a preliminary determination by the judge as to the validity of Brown's testimony that his statement was involuntary.

Clearly if the statement in question had been that of the petitioner, as opposed to the witness Brown, it could not have been used for any purpose until there had been a reliable determination of voluntariness by the trial judge. Jackson v. Denno, 378 U.S. 368, 391, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).[3] And the judge's conclusion that the confession was voluntary would have to appear from the record with "unmistakable clarity." Sims v. Georgia, 385 U.S. 538, 544, 87 S.Ct. 639, 17 L.Ed.2d 593 (1967).

One of the basic underpinnings of a fair trial is the concept that testimony or evidence which is unreliable or untrustworthy must be rejected. This doctrine is not only supported by *Bruton,*

but is underscored as well by Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) in which the Court held that a statement inadmissible against a defendant because of the failure of the police to give adequate *Miranda* warnings may, *if its trustworthiness satisfies legal standards,* be used for impeachment purposes to attack the credibility of the defendant's testimony. The Court noted specifically that Harris made no claim that the statements he made to the police were coerced or involuntary. 401 U.S., at 224, 91 S.Ct., at 643.

■ Given the proposition that a coerced confession is unreliable and must, therefore, be excluded, it is illogical to permit the use of evidence coerced from a witness. Such evidence is no more reliable or trustworthy than is a coerced confession. As a practical matter it may well be less reliable. So-called key witnesses are often potential defendants as well. Their interest in self-preservation may motivate them to avoid or reduce the likelihood of direct involvement by laying the blame elsewhere. Even a witness not faced with potential prosecution may be less motivated toward resisting coercion than would a target defendant. He may succumb to undue pressure for no other reason than to be left alone and allowed to go on his way. According to the witness Brown's sworn testimony, this is precisely what motivated him in the instant case.

■ Coerced testimony from any source is inherently unreliable and, therefore, suspect beyond redemption. Such testimony merits no consideration in the judicial process. The concept of a fair trial is far from an academic proposition to one forced to defend charges of criminal activity. It would be naive to presume that false testimony of a key

**3.** The *Jackson* Court gave its approval to the Massachusetts procedure for dealing with confessions of a defendant, "under which the jury passes on voluntariness only after the judge has fully and independently resolved the issue against the accused. . . ." 378 U.S., at 378, 84 S.Ct., at 1781. The jury, then, hears only those confessions which a "judge actually and independently determines to be voluntary. . . ." 378 U.S., at 378 n. 8, 84 S.Ct., at 1781. The jury may, of course, disagree with the judge's finding of voluntariness and ignore the confession. *Id.*

witness could be anything but potentially "devastating" to a defendant. See Bruton v. United States, 391 U.S. 123, 136, 88 S.Ct. 1620, 20 L.Ed.2d 476.

The issue before us is precisely that faced by the California Supreme Court in the case of People v. Underwood, 61 Cal.2d 113, 37 Cal.Rptr. 313, 389 P.2d 937 (1964) (en banc). *Underwood* involved a fact situation very similar to the instant case. There a witness testified that his prior statements were "forced on" him; that he was intoxicated when questioned by the police; that he was then in custody as a suspected accomplice to the crimes; and that he had been threatened during questioning by the police with prosecution for the crimes. 37 Cal.Rptr. 313, 389 P.2d, at 943.

Chief Justice Gibson, writing for the Court, concluded:

> The same policy considerations which preclude the use of an involuntary statement of a defendant require that the prosecution be precluded from impeaching any witness by the use of an involuntary statement given as the result of pressures exerted by the police. Such a statement by a witness is no more trustworthy than one by a defendant, its admission in evidence to aid in conviction would be offensive to the community's sense of fair play and decency, and its exclusion, like the exclusion of involuntary statements of a defendant, would serve to discourage the use of improper pressures during the questioning of persons in regard to crimes.

61 Cal.2d, at 124, 37 Cal.Rptr., at 319, 389 P.2d, at 943. The Court held that "error was committed in the impeachment of [the witness] by statements which, according to the uncontradicted evidence, were involuntary." 37 Cal. Rptr., at 319, 389 P.2d, at 943.

It was recognized some twenty-five years ago by Justice Frankfurter that the admission into evidence of an incriminatory statement coerced from a third-party may violate the defendant's rights under the Fourteenth Amendment. Turner v. Pennsylvania, 338 U.S. 62, 65–66, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949). See also Hysler v. Florida, 315 U.S. 411, 62 S.Ct. 688, 86 L.Ed. 932 (1942) (dissenting opinion of Justice Black). More recently, the Seventh Circuit Court of Appeals has observed:

> We are not unmindful that a case might well arise where the procurement of evidence to be used in a federal prosecution might have been obtained by proved coercion violative of the constitutional rights of a *witness* and that a serious question might arise in that event upon the use of such evidence upon the trial of defendant. However, such a case is not before us now. . . .

United States v. Wolfe, 307 F.2d 798, 801 (7th Cir. 1962).

And the Fifth Circuit Court of Appeals, emphasizing that "voluntariness is the first and foremost safeguard and 'indicia of reliability' of a confession," has recognized the wisdom of holding a Jackson-type hearing to determine the voluntariness of an extrajudicial confession of a co-principal witness which also incriminates the defendant. Hoover v. Beto, 467 F.2d 516, 533 (5th Cir. 1972), cert. denied, Hoover v. Estelle, 409 U.S. 1086, 93 S.Ct. 703, 34 L.Ed. 2d 673. See also Bradford v. Michigan, 394 U.S. 1022, 89 S.Ct. 1638, 23 L.Ed. 2d 48 (1969) (dissent from denial of certiorari).

The Supreme Court of Illinois has held, in accord with People v. Underwood, *supra*, that the voluntary character of a witness's incriminating extrajudicial statement must be established before the statement can be admitted for impeachment purposes. People v. Newman, 30 Ill.2d 419, 197 N.E.2d 12 (1964); People v. Tate, 30 Ill.2d 400, 197 N.E.2d 26 (1964). See also, People v. Bacon, 2 Ill.App.3d 324, 276 N.E.2d 782 (1971); Comment, "The Right of a Criminal Defendant to Object to the Use of Testimony Coerced From a Witness," 57 N.W.U.L.R. 549. In *Newman*, the

witness gave uncontradicted testimony that her statement to the police was made when she was seven months pregnant, and was the result of her being told that she would have to stay in jail and have her baby there. 197 N.E.2d, at 14.

■ In the case before us, the uncontradicted evidence was that Brown's statement implicating petitioner was the product of some seven hours of police questioning in which Brown himself was threatened with prosecution. It was Brown's testimony that on the day he signed the statement he was under the influence of drugs, and that the statement was largely the result of suggestion by the police as to what had happened. Finally, Brown emphatically denied the truth of the statement on the witness stand.

Faced with Brown's assertion of involuntariness, petitioner's constitutional right to due process compelled the trial judge to make an independent reliable determination as to the voluntariness[4] of the statement before it was heard by the jury. See Jackson v. Denno, 378 U. S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

The fact that Brown's statement was admitted for impeachment purposes only, and not as substantive evidence, see Tr. 150, 178–79, does not permit a different conclusion. The Supreme Court has recognized that incriminating extrajudicial statements from an accomplice present a unique situation "in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." Bruton v. United States, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968).

■■ Furthermore, there was error even if we assume that the lengthy uncontradicted testimony as to voluntariness which took place before the jury

was a form of preliminary inquiry sufficient to satisfy constitutional requirements, and that the judge's admission of the evidence for impeachment purposes could be assumed to be a preliminary determination of voluntariness. Faced with the issue of voluntariness, a trial judge must not only make a preliminary determination of the issue, he must also afford the jury the opportunity to pass on the question of whether a witness's statement was voluntary or coerced. See Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). In the instant case it was error for the trial judge to charge the jury, without any appropriate instruction as to voluntariness, that it was permissible to consider the statement for purposes of impeachment. People v. Underwood, 61 Cal.2d 113, 37 Cal.Rptr. 313, 389 P.2d 937, 943 (1964).

Finally, we are unable to "declare a belief that [the constitutional error discussed above] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). It is apparent from a review of the evidence (summarized in Commonwealth v. LaFrance, 1972 Adv.Sheets 177, 278 N.E.2d 394) that this is not a case in which "the properly admitted evidence of guilt is so overwhelming, and the prejudicial effect of the codefendant's admission is so insignificant by comparison, that it is clear beyond a reasonable doubt that the improper use of the admission was harmless error." Schneble v. Florida, 405 U.S. 427, 430, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972) ("[T]he allegedly inadmissible statements . . . at most tended to corroborate certain details of petitioner's [own] comprehensive confession." 405 U.S., at 431, 92 S.Ct., at 1059.) See also Brown v. United States, 411 U.S. 223, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) ("The testimony erroneously admitted was merely cumulative of other overwhelming and largely uncontradicted evidence properly

---

4. For a recent discussion of the test of voluntariness, *see* Schueckloth v. Bustamonte,

412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

before the jury." 411 U.S. 231, 93 S.Ct. 1570); Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

Error such as that committed in the instant case has been deemed sufficiently fundamental so as to require appellate review even in the absence of timely objection at trial. See People v. Underwood, 61 Cal.2d 113, 37 Cal.Rptr. 313, 389 P.2d 937, 944 (1964). See also Blackburn v. Alabama, 361 U.S. 199, 210–211, 80 S.Ct. 274, 4 L.Ed.2d 242 (1960).

On the basis of "our own reading of the record and on what seems to us to have been the probable impact [of Brown's testimony] on the minds of an average jury," Harrington v. California, 395 U.S. at 254, 89 S.Ct. at 1728, we conclude the evidence was sufficiently prejudicial to petitioner so as to require reversal of his conviction.

The Writ of Habeas Corpus will issue, and respondent is ordered to release the petitioner forthwith.