[Crim. No. 11982. Fourth Dist., Div. One. May 28, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
EMMETTE DIZE MITCHELL, Defendant and Appellant.

390

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Jeffrey J. Stuetz, Deputy State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Jay M. Bloom and Luis R. Vargas, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WORK, J.**—Emmette Dize. Mitchell appeals his conviction for murdering his four-year-old nephew (Pen. Code, § 187)[1] on multiple grounds: (1) Withdrawing life support systems from the allegedly "brain dead" victim without providing Mitchell a judicial hearing to first determine whether death had already occurred, denied due process of law and assistance of counsel; by "pulling the plug" the state participated in the killing while attempted murder charges were pending, thus, precluding it from later charging Mitchell with the murder; and "brain death" is not a proper standard for criminal homicides; (2) Insufficient evidence to show his mental capacity to commit first-degree murder; (3) Judicial

---

[1] All statutory references are to the Penal Code unless otherwise specified.

error at the preliminary examination and trial in admitting his admissions in the absence of independent proof of the homicide corpus delicti; (4) violation of his privilege against self-incrimination (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]); (5) failure to obtain an express waiver of his *Miranda* rights; (6) employing the wrong standard of proof to determine voluntariness of his *Miranda* waiver; (7) failure to consider the totality of the circumstances when ascertaining whether his statements were confessions or admissions; (8) his confession was an involuntary product of both an improper promise of reward and implied promise of leniency.

*Facts*

When Diane Lewis left for school, she entrusted her four-year-old son to the care of Mitchell, who was living with them. Later, a police officer found the boy unconscious in the bathtub face up, completely submerged in water, barefoot and still clothed with a shirt and jeans. While paramedics attempted to revive him, the officer returned to his patrol car and found Mitchell sitting in the back seat. Mitchell was taken to the police station.

After receiving emergency care at Valley Hospital, the victim was taken to Children's Hospital where, on entry, the attending doctor found no pulse (due to lack of oxygen) and dilated pupils showing a lack of brain function. The doctor determined the boy was a victim of "near drowning" and was not capable of breathing without the respiratory support system. Heroic measures eventually resulted in a measurable heart beat, and artificial ventilation induced some respiration. After 10 days the artificial life support equipment was removed, and the artificially induced heart beat and respiration ceased.

An autopsy performed the same day the systems were removed showed the boy was "brain dead" before removal. The autopsy surgeon ruled death was caused by softening of the brain tissue, consistent with "near drowning" (prolonged submersion in water, cutting off the oxygen flow to the brain).

After proper *Miranda* warnings, Mitchell told the officer he had been babysitting the victim who was running around the house screaming, yelling and calling him names. When Mitchell noticed the victim had broken his headphones, he picked the boy up and hit his head against

the ceiling. The victim threatened to tell his mother. Sometime later Mitchell "snapped and grabbed the victim around the neck in an attempt to strangle him." When the boy did not die, Mitchell decided to drown him in the bathtub. He filled the tub with 10 to 15 inches of water and held the victim's face down for about 5 minutes, then left the victim in the tub and went outside. He returned five minutes later, called the police and told them he had just murdered his nephew.

The trial court, sitting without a jury, found the murder to be of the first degree.

### Discussion

### THE BRAIN DEATH ISSUES

For the first time, on appeal, Mitchell claims he had a due process right to participate in a judicial hearing held to determine death *before* the victim was removed from the life-support system. Does the "brain-death" standard (Health & Saf. Code, § 7180) apply to a criminal homicide case? What was the proximate cause of the death? Was the state in any way involved in the decision to remove the victim from life support?

First, Mitchell relies on *People* v. *Underwood* (1964) 61 Cal.2d 113, 126 [37 Cal.Rptr. 313, 389 P.2d 937], for the proposition that where there are special policy considerations, an appellate court will review the issue on appeal despite the neglect of counsel to make the appropriate objection at trial. In *Underwood*, counsel failed to make a timely and sufficient objection whereas here there was no objection made. Further, the issue in *Underwood* dealt with the admissibility of involuntary statements, the policy considerations on that issue are well settled. However, Mitchell attempts to escalate the issue to one of constitutional importance. The issue should have been raised at trial to preserve it for appeal. (*People* v. *Saddler* (1979) 24 Cal.3d 671, 684 [156 Cal.Rptr. 871, 597 P.2d 130].)

In any event, Mitchell had ample opportunity, both at the preliminary examination and at trial, to litigate his contention the victim was not legally "dead" before the life-support systems were removed. The prosecution bore the burden of proving the victim was dead before the supports were removed. The issue was contested and there is no claim Mitchell's defense was hampered in any way by lack of the preremoval hearing.

■ *The Statutory Standard of Brain Death Satisfies
the "Killing" Element of Murder*

As of 1974, the statute defining death read: "A person shall be pronounced dead if it is determined by a physician that the person has suffered a total and irreversible cessation of brain function. There shall be independent confirmation of the death by another physician. [¶] Nothing in this chapter shall prohibit the physician from using other usual and customary procedures for determining death as the exclusive basis for pronouncing a person dead." (Health & Saf. Code, § 7180.)[2]

In many cases today, life support equipment can maintain an expired person's circulation and respiration artificially. A respirator can maintain physical breathing, as well as balance oxygen and carbon dioxide levels. However, if the victim has been without respiration long enough to have caused permanent and irreversible brain damage, the victim will forever remain in a vegetative state, a mere repository for organs capable of surviving if transplanted elsewhere, but incapable of regenerating the brain of the corpse in which they are contained. Under the common law definition of death, the patient is alive.[3]

In the context of criminal homicide cases, brain death poses varied problems. That a transplant surgeon may become a superseding intervening cause of a homicide victim's death has led some hospitals to enforce a blanket prohibition of transplanting from victims of criminal acts. (*New York City Health & Hosp. Corp.* v. *Sulsona* (1975) 81 Misc.2d 1002 [367 N.Y.S.2d 686, 688, 76 A.L.R.3d 905].)

In the absence of statute, courts might apply the common law occasionally allowing the malum in se act to go unpunished.[4]

---

[2]When there is no statutory law defining death, courts may apply the common law definition. The issue of death in homicide cases usually arises in tissue transplant cases. The public has shown approval of tissue transplant through Legislature adoption of the Uniform Anatomical Gift Act. (Health & Saf. Code, § 7151.6.) Mitchell argues the Uniform Anatomical Gift Act does not expressly apply to criminal cases. We find a specific application unnecessary in order to hold that impliedly the same definitions of death would apply whether a person died naturally or at an aggressor's hand.

[3]The cessation of life, the ceasing to exist; defined by physicians as a total stoppage of the circulation of the blood and a cessation of the animal and vital functions consequent therein, such as respiration, pulsation, etc. (Black's Law Dict. (4th ed. rev. 1968) col. 1, p. 488; *Estate of Schmidt* (1968) 261 Cal.App.2d 262, 273 [67 Cal.Rptr. 847].)

[4]See Runk, *Brain Death: The Emerging Common Law Definition in Criminal Homicide* (1979) 6 Western St.U. L.Rev. 295, 305, citing the following cases: In People

Depending on the definition of death used, the crime would be murder or attempted murder. Where the accused intended to murder the victim but, using the common law definition of death, causation was interrupted by the transplant surgeon, the accused may be convicted of only attempted murder, battery or assault, all of which have much less severe punishments when compared to the punishment for criminal homicide. It has been asserted that morally reprehensible behavior of murder should be the focal point, not whether the accused was fortunate enough to have a subsequent intervention in causation. (See Capron, *The Purpose of Death: A Reply To Professor Dworkin* (1973) 48 Ind.L.Rev. 640.)

Facts similar to ours appear in *Com.* v. *Golston* (1977) 373 Mass. 249 [366 N.E.2d 744]. Massachusetts had no statutory death definition and so the common law definition prevailed until this case. The trial judge charged the jury on brain death, and was upheld on appeal. Following the Flores and Lyons cases California adopted a brain death statute as an urgency measure providing: "A person shall be pronounced dead if it is determined by a physician that the person has suffered a total and irreversible cessation of brain function. There shall be independent confirmation of death by another physician.

"Nothing in this chapter shall prohibit a physician from using other usual and customary procedures for determining death as the exclusive basis for pronouncing a person dead." (Health & Saf. Code, § 7180.)[5]

---

v. Flores, No. 20190 (Sonoma Co. Mun. Ct. Dec. 19, 1973); No. N746-C Sonoma Co. Super. Ct. July 23, 1974), the deceased was struck by an intoxicated driver on the *wrong side of the road. The deceased suffered brain death and,* before common law death, surgeons made all necessary arrangements and transplanted the victim's heart. At the time California had no statute defining death and so the court held the surgeons may have caused the deceased's death and released Flores. On the other hand, in People v. Lyons, 15 Crim.L.Rep. 2240, No. 56072 (Alameda Co. Super. Ct. May 21, 1974), the victim sustained total brain death as a result of a gunshot wound, although his breathing was sustained artificially. After two days the doctors transplanted. The trial judge accepted a brain death definition after hearing the expert testimony of brain death definition supporters.

[5]This definition seems unambiguous. However, in In re Benjamin C. (Feb. 8, 1979) No. J914419, L.A. Super. Ct.), the word "total" caused difficulty. A three-year-old child, struck by a car incurred irreversible brain damage, was comatose and on a respirator. His life expectancy on this equipment was one year, and off the equipment only minutes. However, the child did not have "total" cessation of brain function. His EEG showed some activity (unlike here where there was none), body temperature was acceptable and there was a pulse. He responded to pain, but it was concluded by the physicians that it was only a reflex action, not brain derived. His probability of recovery *was nil due to* irreversible brain damage. When the respirator was disconnected

A similar alternative brain death statute (Kan. Stats., § 77-202 was upheld by the Kansas Supreme Court). (*State v. Shaffer* (1977) 223 Kan. 244 [574 P.2d 205].) Hospital surgeons declared the victim dead and transplanted a kidney. The Kansas Supreme Court upheld the statute as "based on practical medical considerations in keeping with advanced medical technology." (*Id.*, at p. 209.) Other states have followed in adopting a brain death definition.[6]

Adopting brain death as the standard here does not intrude on Mitchell's rights. The prosecution must prove brain death occurred by proof beyond a reasonable doubt. Mitchell argues Dr. Fukomoto, the pathologist who did the autopsy, was not an expert in brain death and his testimony should not have been admitted over his objection. Dr. Fukomoto testified hospital records showed the boy had classic symptoms of brain death, but that he, personally, was vague on the brain death standard in California.

Dr. Fukomoto was not testifying as an expert on brain death, he was testifying as a pathologist, gave his medical opinion about the victim's status at the time the life-support systems were removed and the facts underlying his opinion. The victim's poor prognosis for brain function was also established by Dr. Worcester's testimony. The facts established sufficient evidence for the trier of fact to determine the issue of death occurring beyond a reasonable doubt. Mitchell could have cross-examined both doctors and presented his own experts on the issue if he desired.

Since we hold substantial evidence shows there is no reasonable doubt the victim was "brain dead" when taken off life support, we do not reach the issue of causation. ■ . Mitchell's final contention, the state

breathing stopped within 17 minutes. The brain death definition was upheld only after much controversy regarding the scope of the definition. See Runk, *Brain Death: The Emerging Common Law Definition in Criminal Homicide, supra*, 6 Western St.U. L.Rev. 295, 305.)

[6]See Alaska Statutes (supp. 1981) section 09.65.120; California Health and Safety Code, section 7180; Georgia Code Annotated, title 88, section 1715.1; Hawaii Revised Statutes (supp. 1981) section 327C-1; Idaho Code, section 54-1819; Illinois Annotated Statutes (Smith-Hurd 1978), chapter 1101/2, section 302(b); Iowa Code Annotated, section 702.8; Kansas Statutes Annotated, section 77-202; Maryland Public Heath Code Annotated 54(f); New Mexico Statutes Annotated (1978) section 12-2-4; North Carolina General Statutes (1981) section 90-322; Oklahoma Statutes Annotated (supp. 1981-1982) title 63, section 1-301, subdivision (g); Virginia Code, section 54-325.7; West Virginia Code, sections 16-10-2 and 16-19-1.

owed him a duty to insure a judicial hearing transpired before removal of the life-support system once criminal proceedings commenced, is meritless. There is no evidence showing affirmative state involvement in the decision to remove life support. In its absence we decline to hold any such duty arises.

### ■ *The Evidence Sufficiently Shows Intent, Premeditation and Deliberation*

On appeal, after review of the entire record, viewing the evidence in the light most favorable to respondent and presuming the existence of every fact reasonably adduceable from the evidence, the court must determine whether substantial evidence supports the finding of premeditation and deliberation. (*People* v. *Green* (1980) 27 Cal.3d 1, 55 [164 Cal.Rptr. 1, 609 P.2d 468]; *People* v. *Johnson* (1980) 26 Cal.3d 557 [162 Cal.Rptr. 431, 606 P.2d 738].) In *People* v. *Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942], the California Supreme Court set out the standard to determine the existence of premeditation and deliberation: "The type of evidence which this court has found sufficient to sustain a finding of premeditation and deliberation falls under three basic categories: (1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as 'planning' activity; (2) facts about defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' (*People* v. *Thomas* ... 25 Cal.2d 880, at pp. 898, 900, 901); (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the jury can reasonably infer from acts of type (1) or (2).

"Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3). . . ." (*People* v. *Anderson, supra*, 70 Cal.2d 15, 26-27.)

The length of time during which an intent to kill need be held varies with the individual and the circumstances and need only be so long as to permit the defendant to maturely and meaningfully contemplate the gravity of his intended act. (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 713 [112 Cal.Rptr. 1, 518 P.2d 913].)[7]

The evidence shows Mitchell planned and intended to kill his nephew. After the boy did not die from the choking "like in the movies," Mitchell took him into the bathroom, put the stopper in the tub, drew 12-15 inches of water and held him face down until he appeared to be dead, all in furtherance of a preconceived plan to kill.

Mitchell's testimony at trial and statements to the police explained his motive for murder. He claimed desire for sexual and physical abuse motivated him to commit the crime to achieve pain and eventual death.[8] To further this self-destructive intent, Mitchell reported his crime to the police, giving them his location and description. By Mitchell's own admission, his intent was to drown the victim after his unsuccessful strangulation attempt.

Mitchell relies on *People* v. *Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959], and *People* v. *Goedecke* (1967) 65 Cal.2d 850 [56 Cal.Rptr. 625, 423 P.2d 777, 22 A.L.R.3d 1213], for the proposition that selection of an alternative means of killing is insufficient by itself to establish first-degree murder. This incorrectly interprets the two cases. In *People* v. *Wolff, supra*, the defendant's first-degree murder conviction was reduced to second degree because the defendant used an alternative method to kill his victim, not because defendant's mental state failed to meet the minimum standards required to sustain a first-degree murder conviction. (*Id.*, at pp. 821, 822.) Relying on *Wolff*, the court in *People* v. *Godecke, supra*, held similarly. (*Id.*, at pp. 857-858.)

Finally, Mitchell argues he lacked the requisite mental state to be convicted of the crime. Specifically, he stresses the psychiatric findings of his mental illness. However, this testimony is not consistent. After testifying Mitchell could not maturely and deliberately reflect on his

---

[7]Disapproved on other grounds in *People* v. *Flannel* (1979) 25 Cal.3d 668, 684, footnote 12 [160 Cal.Rptr. 84, 603 P.2d 1].

[8]At the sentencing hearing he also repeatedly asked the court to impose the death penalty.

actions, Dr. Klatte stated Mitchell had the ability to meaningfully reflect on his acts. Dr. Anderson testified Mitchell could not meaningfully and maturely reflect on his acts, but conceded his acts were consistent with both premeditation and malice aforethought.

Dr. Sharma disputed the findings of the two other psychiatrists and diagnosed Mitchell's behavior as simply his way of gaining attention, finding no sign of psychotic mental illness, and concluded he was aware he committed murder. Even where there is unanimity of opinion, triers of fact "are not automatically required to render a verdict which conforms to the expert opinion." (*People* v. *Drew* (1978) 22 Cal.3d 333, 350 [149 Cal.Rptr. 275, 583 P.2d 1318].)

There is substantial evidence Mitchell was capable of forming malice and of premeditating an intentional killing.

### The Corpus Delicti Was Established Independently of Mitchell's Admissions and Confession

Mitchell contends the trial court impermissibly considered his extrajudicial statements at the preliminary examination without establishing the corpus delicti. Specifically, Mitchell claims the state failed to establish the criminal agency by which the victim met his death on facts other than his statements.

The corpus delicti of a homicide consists of: (1) the death of the alleged victim, and (2) the existence of some criminal agency as the cause. The state needs only to show a reasonable probability the criminal act of another caused the death. (*People* v. *Cantrell* (1973) 8 Cal.3d 672, 679 [105 Cal.Rptr. 792, 504 P.2d 1256]).[9] The corpus delicti may be established by circumstantial evidence and by the reasonable inferences to be drawn from such evidence. (*Cantrell, supra*; *People* v. *Miller* (1969) 71 Cal.2d 459, 477 [78 Cal.Rptr. 449, 455 P.2d 377].) For corpus delicti purposes the person charged need not be shown to have committed the crime. (*People* v. *Lopez* (1967) 254 Cal. App.2d 185, 189 [62 Cal.Rptr. 47].)

Here, the 4-year-old boy was found unconscious, floating in a bathtub containing 10 to 15 inches of water, clothed in jeans and a top

[9]Disapproved on other grounds in *People* v. *Wetmore* (1978) 22 Cal.3d 318, 324 [149 Cal.Rptr. 265, 583 P.2d 1308] and in *People* v. *Flannel, supra*, 25 Cal.3d 668, 684-685, footnote 12.

with bruises to his neck. Shortly after the police arrived at the apartment complex, Mitchell personally contacted them. The officer noticed Mitchell's watch was wet.

A drowning is not a death by natural causes and therefore establishes the possibility of criminal agency. The observed facts do not point to the likelihood this was either an accidental or suicidal death, but most reasonably supports the inference of a criminal agency. ■ "To meet the foundational test the prosecution need not eliminate all inferences tending to show a noncriminal cause of death. Rather, the foundation may be laid by the introduction of evidence which creates a reasonable inference that the death could have been caused by a criminal agency [citation] . . . ." (*People v. Jacobson* (1965) 63 Cal.2d 319, 327 [46 Cal.Rptr. 515, 405 P.2d 555]; *People v. Towler* (1982) 31 Cal.3d 105 [181 Cal.Rptr. 391, 641 P.2d 1253].) ■ The complete corpus of murder was established, the admissions properly admitted and the information properly upheld. (*People v. Mardian* (1975) 47 Cal. App.3d 16, 38-39 [121 Cal.Rptr. 269].)

■ Mitchell's corpus delicti objection at trial is also meritless. Again he speculates the victim "could have easily drowned accidentally or even purposefully committed suicide." However, the testimony described the fully clothed victim found floating in a bathtub filled with 10 to 15 inches of water. Officer Alvarez again detailed his contact with Mitchell. Mitchell's mother testified Mitchell had serious difficulties coping with mental problems and was very unstable. Mitchell was alone with the victim the night of the drowning. Bruises were seen on the victim's neck after admission to the hospital.

■ *Mitchell's Miranda Rights Were Not Violated.*

Mitchell claims he was denied his privilege against self-incrimination when the officers improperly continued interrogating him after he had invoked his right to remain silent. The colloquy in question is:

"Clark: Okay. It says you have the absolute right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to consult with an attorney, to be represented by an attorney, and to have an attorney present before and during questioning. If you cannot afford an attorney, one will be appointed by the court free of charge to represent you before and during questioning, if you desire. You can decide at any time to exercise these rights and not answer

any questions or make any statements. Do you understand each of these rights I have explained to you?

"Mitchell: Uhum.

"Clark: You've got say 'yes' or 'no.'

"Mitchell: Yes.

"Clark: Okay. Having these rights in mind, do you wish to talk to us now reference to what you have just been arrested for? ·

"Mitchell: Uhm, well, to tell you the truth I'd like to read ... I have a book in my bag I'd like to read. I'd like to have my cigarettes.

"Clark: Okay. First you've got to answer 'yes' or 'no,' the last question.

"Mitchell: Do I get to read my book?

"Clark: Huh?

"Mitchell: Do I get to read my book?

"Clark: Yeah, you can read your book.

"Mitchell: Okay.

"Clark: Well, first let's go back a little. Do you understand each. of these rights I've explained to you?

"Mitchell: Yes, I understand the rights.

"Clark: Okay, having these rights in mind, do you wish to talk to us now regarding this incident that you have been arrested for.

"Mitchell: What do you want to know?

"Clark: I just want to ask you some questions. Do you want to answer them?

"Mitchell: Yes, I'll answer. Go ahead."

The trial court found Mitchell was properly advised, knowingly and intelligently waived his rights and freely and voluntarily entered into the conversation with the police. Reversal may be premised only on this court's finding the trial court's ruling was palpably erroneous. (*People v. Cooper* (1970) 10 Cal.App.3d 96, 108 [88 Cal.Rptr. 919].) When independently determining whether the trial court's finding of an intelligent waiver was proper, the evidence is viewed in the light most favorable to the prosecution to the extent it is supported by the record. (*People v. Jimenez* (1978) 21 Cal.3d 595, 608-609 [147 Cal.Rptr. 172, 580 P.2d 672].)

Once the suspect indicates his refusal to waive his constitutional rights, all further interrogation must cease. *People v. Pettingill* (1978) 21 Cal.3d 231, 237-241 [145 Cal.Rptr. 861, 578 P.2d 108].) Mitchell responded "Uhm, well, to tell you the truth I'd like to read . . . I have a book in my bag I'd like to read. I'd like to have my cigarettes." In context, this nonresponsive rejoinder is not a *Miranda* invocation. The officer went on to specify what Mitchell was saying and asked him again to respond to her question—whether he would like to answer questions with regard to his arrest. After having clarified the question, Mitchell unequivocally agreed to answer all questions. Mitchell spoke at length, and in detail, with the officers and never sought to invoke his rights. In *People v. Johnson* (1969) 70 Cal.2d 541, 558 [75 Cal.Rptr. 401, 450 P.2d 865, 43 A.L.R.3d 366],[10] the court stated: "[o]nce the defendant has been informed of his rights, and indicates that he understands those rights, it would seem that his choosing to speak and not requesting a lawyer is sufficient evidence that he knows his rights and chooses not to exercise them."

Mitchell cites three reasons his waiver was involuntary. First, he was compelled to speak by police with promises to reward him with his book. Properly quoted, the excerpt which Mitchell refers to reads as follows:

"Clark: . . . Okay, we're going to terminate this interview for a little bit at about 2234 hours. Okay?

"Mitchell: Okay.

---

[10]Disapproved on other grounds in *People v. DeVaughn* (1977) 18 Cal.3d 889, 899, footnote 8 [135 Cal.Rptr. 786, 558 P.2d 872].

"Clark: I'm going to leave you sit here for a minute. Smoke your cigarettes or whatever you got ... do you want a drink or anything?

"Mitchell: Can I have my book?

"Clark: You've got your book, man. Okay, it's 2234 hours." The officer merely pointed out to Mitchell that he had his book and he was allowed to read. There is no hint from the above excerpt that the officer promised Mitchell his book as a reward or coerced him to talk based on the expectation he would later receive a reward.

Second, Mitchell argues his waiver is not shown to be knowing and intelligent since he was not aware the pending charge of attempted murder would be raised to murder if his victim actually died. In *People v. Neely* (1979) 95 Cal.App.3d 1011, 1017 [157 Cal.Rptr. 531], the court states: "The *Miranda* decision neither holds nor suggests that he had the additional right to be informed of the actual charge impending against him at the time, nor that the officers' failure to give him this information invalidated his waiver."

Mitchell relies on *People v. Walker* (1959) 170 Cal.App.2d 159, 162 [338 P.2d 536], for the premise that a defendant might waive a constitutional right when facing one charge but not to give up that right when confronted with a graver one. In reversing the conviction in *Walker*, the appellate court reasoned the defendant might be willing to waive a jury on the charge of possession of heroin but would not care to do so on the graver offense of possession of heroin for sale. *Walker* is not analogous. Here, Mitchell was only facing actual charges of attempted murder; the child had not been diagnosed as dead.

It is crucial that police be allowed to talk to a suspect who is willing to talk as soon as possible after a crime has been committed. *Miranda* is designed to protect those individuals who wish to invoke their right against self-incrimination. If a suspect is properly advised of his *Miranda* rights and elects to waive them, anything he says may be used against him even if it relates to crimes which the officers were initially unaware.

Mitchell next claims his waiver was involuntary because he was mentally ill. However, the transcript of the lengthy interrogation shows Mitchell coherently responded to all questioning and acknowledged his

understanding of his rights, consistent with Dr. Sharma's testimony Mitchell could comprehend and reflect meaningfully on his acts.

Finally, Mitchell argues Officer Clark failed to get his separate, express *Miranda* waiver of counsel before questioning, thus denying his privilege against self-incrimination. However, express waivers are not required under the Fifth Amendment and *Miranda (North Carolina v. Butler* (1979) 441 U.S. 369 [60 L.Ed.2d 286, 99 S.Ct. 1755]; *People v. Johnson, supra,* 70 Cal.2d 541, 557-558), nor do we find express *Miranda* waivers to be required under article I, section 15 of the California Constitution as a matter of independent state grounds. In *North Carolina v. Butler, supra,* 441 U.S. 369, the court stated: "The only question is whether ... [defendant] waived ... the right to the presence of a lawyer. Neither the state court nor the respondent has offered any reason why there must be a negative answer to that question in the absence of an *express* waiver.... Even when a right so fundamental as that to counsel at trial is involved, the question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' [Citations.]" (*Id.,* at pp. 374-375 [60 L.Ed.2d at p. 293].) The record shows Mitchell understood his rights, including that of counsel, and waived each by agreeing to answer the officer's questions. He does not, even now, deny the implication he intended to waive counsel.

### ■ There Is No Showing the Trial Court Used an Incorrect Standard of Review.

Mitchell contends the trial court *may* have applied the wrong standard of proof to determine whether he voluntarily, knowingly and intelligently waived his *Miranda* rights. The voluntariness of a defendant's statement to the police must be established beyond a reasonable doubt. (*People v. Murtishaw* (1981) 29 Cal.3d 733 [175 Cal.Rptr. 738, 631 P.2d 446], decided after this trial.) *Murtishaw* did not announce a new standard by which to evaluate the validity of a defendant's *Miranda* waiver. The relevant portion of the *Murtishaw* opinion reads: "In *People v. Jimenez* (1978) 21 Cal.3d 595 [147 Cal.Rptr. 172, 580 P.2d 672], we held that the prosecution must prove the voluntariness of a confession beyond a reasonable doubt. (21 Cal.3d at p. 608.) That requirement applies equally to admissions by a defendant (see *People v. Alfieri* (1979) 95 Cal.App.3d 533, 542 [157 Cal.Rptr. 304]), and since confessions or admissions obtained without a valid waiver of *Miranda* rights are deemed to be coerced, the prosecution bears also the burden

of proving waiver beyond a reasonable doubt. (*People* v. *Daniels* (1969) 1 Cal.App.3d 367, 373-374 [81 Cal.Rptr. 675].)" (*People* v. *Murtishaw, supra*, 29 Cal.3d 733, 753.) There is no evidence the trial court applied the wrong standard of review.

Further, the trial court fully evaluated the circumstances surrounding the confession. When the prosecution sought to introduce Mitchell's taped confession, the court forced the prosecution to establish the voluntariness of the confession. The interviewer testified as to the time, place and manner of the interview. Mitchell's counsel conducted a thorough voir dire examination. The court considered Mitchell's mental maturity in determining the voluntariness of his confessions; it had ample opportunity to observe Mitchell in court and evaluated the pertinent portions of the interview transcript. The trial court made its ruling on a "totality of the circumstances." Mitchell's procedural argument that *People* v. *Jimenez, supra*, 21 Cal.3d 595, 604, required the court to hold a special hearing outside the presence of the jury is inapposite here where there was no jury. Further, while not labeling it a special hearing, the court's special inquiry complied with the *Jimenez* requirement.

Affirmed.

Staniforth, Acting P. J., and Cazares, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 28, 1982. Bird C. J., Mosk, J., and Kaus, J., were of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.